M. DANTON RICHARDSON (State Bar No. 141709)
mdantonrichardson@yahoo.com
LEO E. LUNDBERG, JR. (State Bar No. 125951)
leo.law.55@gmail.com
LAW OFFICE OF M. DANTON RICHARDSON
131 N. El Molino Ave., Suite 310
Pasadena, CA 91101

*Attorneys for Plaintiff,*
LITTLE ORBIT LLC

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LITTLE ORBIT LLC, a California Limited Liability Company,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>DESCENDENT STUDIOS INC., a Texas corporation, and ERIC PETERSON, an individual,<br><br>　　　　　Defendants.<br>_____<br><br>DESCENDENT STUDIOS INC., a Texas corporation,<br><br>　　　　　Counterclaimant,<br><br>　vs.<br><br>LITTLE ORBIT LLC, a California Limited Liability Company,<br><br>　　　　　Counter Defendant.<br>_____ | Case No.: 8:20-cv-00089-DOC-JDE<br><br>Judge:　　Hon. David O. Carter<br><br>**FIRST AMENDED COMPLAINT FOR:**<br>　1. **BREACH OF CONTRACT;**<br>　2. **NEGLIGENT MISREPRESENTATION;**<br>　3. **FRAUD;**<br>　4. **TRADE LIBEL/COMMERCIAL DISPARAGEMENT; AND**<br>　5. **DECLARATORY RELIEF** |

1

Plaintiff Little Orbit LLC, by and through its undersigned counsel, hereby brings this First Amended Complaint against Defendants Descendent Studios Inc. and Eric Peterson and in support thereof alleges the following:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1332 given that this matter is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## PARTIES

3. Plaintiff Little Orbit LLC ("Little Orbit") is a limited liability company organized under the laws of the State of California, with its principal place of business in Rancho Santa Margarita, California. The Members of Little Orbit are (a) Matthew Paul Scott, who is a resident of Laguna Beach, California; and (b) Wilbur Quon, who is a resident of Tustin, California. Little Orbit is engaged in the business of creating, developing, publishing, advertising, marketing and selling of electronic games.

4. Defendant Descendent Studios Inc. ("Descendent Studios") is a corporation organized under the laws of the State of Texas, with its principal place of business in Austin, Texas. Descendent is or was engaged in the business of developing electronic games.

5. Defendant Eric Peterson ("Peterson") is an individual who is a resident of Austin, Texas. Peterson, at all times relevant herein, was the CEO of Defendant Descendent Studios and was the primary point person in dealing with Little Orbit.

## FACTUAL ALLEGATIONS

### Little Orbit

6. Plaintiff Little Orbit is a worldwide video game developer and publisher formed in January 2010 with a focus on AAA licensed-based entertainment products. Little Orbit has developed and published games on all relevant gaming platforms and continues to pioneer electronic entertainment for consumers of all ages. Over 20 games have been published by Little

Orbit including "Kung Fu Panda: Showdown of Legendary Legends", "Adventure Time: Finn and Jake Investigations", "Young Justice", "Falling Skies the Game", "APB Reloaded," and "Fallen Earth."

### The Descent Game

7. In 1995 Interplay Productions Corp., a major video game developer and publisher, released a game known as Descent, a first-person shooter ("FPS") game developed by Parallax Software. Descent popularized a subgenre of FPS games using the "six degrees of freedom" which is the movement of a rigid body (the game player's avatar) in three-dimensional space in six different ways: forward/back, up/down, left/right, yaw, pitch, roll. Descent was also the first FPS to entirely feature 3D graphics.

8. Descent was a commercial success, selling over 1.1 million units, together with its sequel, Descent II, as of 1998. Descent also received great acclaim in the gaming industry with commentators and reviewers comparing it to Doom, a previous gaming title which was widely praised in the gaming press as one of the most important and influential titles in gaming history. In particular, Descent was praised for its unrestrained range of motion and full 3D graphics. The combination of traditional first-person shooter gameplay with that of a space flight simulator was also very popular with consumers. Descent's success resulted in the creation of expansion packs and the sequels Descent II (1996) and Descent 3 (1999).

### Descendent Studios

9. In or around November of 2014, several former game developers working on a game known as Star Citizen, including Defendant Peterson, announced that they were forming Descendent Studios to work on a game similar to Descent in play style, with the working title "Ships That Fight Underground."

10. Peterson became the Chief Executive Officer of Descendent Studios and served in that capacity during all times material to this action.

11. On information and belief, in or around March of 2015 Descendent entered into a licensing agreement with Interplay to license the Descent name to Descendent Studios for the new

game that Descendent was developing. Based on this license, the name of the game being developed by Descendent Studios was changed to "Descent: Underground."

12. Based on the popularity of the Descent game among fans, Descendent Studios was able to raise funds for the development of Descent: Underground through a Kickstarter campaign which, on information and belief, raised over $600,000.

### The Agreement Between Little Orbit and Descendent Studios

13. In or around August of 2017 Little Orbit was approached by Descendent Studios about providing the financial support necessary to complete the development of the Descent game in return for which Little Orbit would publish the Descent: Underground game subject to the payment and royalty terms agreed upon between the parties.

14. Descendent Studios represented that it was "developing a reboot of the Descent franchise using modern, high-fidelity game systems."

15. Descendent Studios further represented and acknowledged that "Descent was one of the most iconic and revolutionary game franchises of the 1990s and the name has considerable brand awareness."

16. The parties' discussions culminated in Little Orbit and Descendent Studios entering into a "Development Agreement" effective September 1, 2017 (the "Agreement"), under which Little Orbit contracted with Descendent Studios to develop the Descent: Underground game (the "Game") which Little Orbit would publish.

17. Based on the representations and assurances by Descendent Studios made during the parties' discussions during the months of August and September of 2017, Little Orbit agreed to publish the game as described:

> Descent: Underground invites players to pilot spacecraft fighting for resources and fame inside hazardous asteroid mines. It melds the full movement freedom of the originals with modern role-play based team play, compelling story, and exciting improvements in graphics, artificial intelligence, meta-game, e-sports, and virtual reality!

**Defendants' Express Representations Related to the Game**

18.　In an effort to induce Little Orbit into entering into the Agreement, Defendants expressly represented during the parties' discussions during the months of August and September, 2017, that Descendent was capable of developing the Game which, at all times, would be in conformity with common and accepted industry standards, including the use of modern, high-fidelity game systems," and would satisfy general standards of quality to be expected from a developer of electronic games as well as the specific specifications in the Agreement.

19.　As confirmed by the Development Agreement, Descendent Studios made the following express representations:

a) "11.1.2  [Developer] shall Develop the Game in a good and workmanlike manner and to the standards of a high quality game developer and the Game shall be of sound workmanship, satisfactory quality and free of Defects;"

b) "11.1.3　Developer has employed and will continue to employ for the entire development of each Game, an adequate development team. Such development team shall be of the minimum number and skill level of a first class developer. Further, as set forth on Schedule 4, attached hereto and incorporated herein, such development team members shall be exclusively dedicated to development of such Game for the periods specified therein. In the event that a majority of the development team currently employed by Developer and assigned to any Game as set forth on Schedule 4 leaves, terminates or in any other manner ends their employee relationship with Developer, Developer shall promptly give Publisher written notice thereof;"

c) "11.1.4  Developer has sufficient personnel and resources to complete the Game in a timely manner;"

d) "11.1.5. The Game will operate substantially in accordance with the Specification when Published and be capable of the standards of performance set out in the Specification;"

e) "11.1.6. The Game and all Publishing and use of it will not infringe the Intellectual Property Rights of any third party and nor give rise to any liability to any third party;"

f) "11.1.7. Developer is responsible for acquiring all rights necessary for the supply of the Game on the terms of this Agreement, including without limitation the rights to use the Unreal Engine, the Descent name, and all of Developer's proprietary code without violating any Intellectual Property Rights of any third party. For the purpose of clarity Developer is liable for all licensing fees regardless of total cost."

g) "11.1.8. [Developer] has not disposed of any right, title or interest in or to the Game or Intellectual Property Rights in it, or otherwise dealt with the same in any way that is inconsistent with the terms of this Agreement;"

h) "11.1.9. [Developer] will not challenge the Intellectual Property Rights or rights of use of Publisher in the Game and will not do any act which may undermine, prejudice or invalidate any such rights;"

i) "11.1.10. The Game will not contain any content or material which is technically harmful, such as computer viruses, worms, logic bombs or other malicious software or harmful data, or is defamatory, untrue, discriminatory, obscene, inflammatory, racist, sexually explicit, or otherwise is unlawful or which gives rise to civil or criminal liability;"

20. Peterson was the point person in making the above representations to Little Orbit and it was based on Peterson's and Descendent's representations over the course of the parties' discussions in negotiating the Agreement in August and September of 2017 that the foregoing representations were included in the Development Agreement.

21. Pursuant to Schedule 2 of the Agreement the parties also expressly agreed to and set out the scope of what Defendants were required to deliver pursuant to the Agreement, as well as in the Game Design Document that Defendants later provided to Little Orbit which was mutually agreed to, and in the GAMESTORM scope that was also agreed to and paid for by Little Orbit. Combined, the foregoing documents expressly set out the scope for the completed game

and Defendants commitments regarding same. In spite of being provided no less than nine (9) extra months and being paid far more than the initial agreed price, Defendants failed to deliver the required scope of game items.

22. Pursuant to Schedule 3 to the Development Agreement, Descendent Studios agreed to a "Milestone and Payment Schedule" which provided "Publisher will pay to Developer an aggregate of $500,000 on the dates and following the completion of the Milestones described in the attached Development Milestones spreadsheet."

23. The Milestone and Payment Schedule provided for 7 different milestones and delivery dates culminating with "Milestone 7 May 15, 2018 Release Candidate PC $75,000."

### The "Terms Agreement"

24. The Game was initially planned for a May 2018 retail release date. When it became clear from Descendent's slow and problematic progress that deadline would not be met, the release date for the Game was pushed back to a November 2018 release date. Further delays required the release date for the Game to be pushed back a final time to a February 2019 release date.

25. Based on Defendants' repeated representations and promises, Little Orbit had advertised and promoted, first, the May 2018 release date and then later the November 2018 release date to the trade, the gaming industry and consumers. Missing these dates, especially the November 2018 release date, meant not having the Game ready in time for the 2018 holiday shopping season, which represents a huge loss financially, as well as a great set-back for the Game and Little Orbit in public perception.

26. As a result of Descendent's repeated failures to meet the agreed upon delivery dates, the parties discussed ways for Descendent to still be able to deliver the Game. Those discussions culminated in the Parties agreeing to a "Terms Sheet" dated November 28, 2018.

27. Pursuant to the Terms Sheet, Little Orbit committed to continue funding Descendent's monthly payroll in the amount of $60,000 per month "in return for services and deliverables by Descendent in connection with the Game…so long as such services and

deliverables are provided in a timely manner and provided Descendent does not materially breach its obligations in providing such services and deliverables."

28. The Parties also agreed on a new extended delivery date for the final PC Version of the game of January 25, 2019 in order to release the game in February. Descendent failed to meet the extended delivery date given the deliverable actually provided by Descendent on January 25, 2019 was rejected as the Final PC Version, having failed to meet the definition of "Final Version" in the Original Agreement.

29. The deadline for the Final PC Version was set in the Development Agreement and Descendent missed the deadline. Numerous extensions for delivering the Final PC Version were established, but Descendent failed to meet each extension.

30. Descendent also failed to meet the required specifications according to Schedule 2 in the Agreement and the Game Design Document they submitted. As a result, Little Orbit was compelled to, at great additional expense, engage additional resources to assist, and in many cases take over, certain aspects of the development of the Game due to Descendent's poor performance and inability to provide services as a "first class developer" as agreed in Section 11.1.3 of the Development Agreement.

31. Descendent also failed to provide the assignment of the Trademark License Agreement dated March 5, 2016, by and between Interplay Entertainment Corp. and Descendent as required under Section 9 of the Terms Sheet Amendment.

32. Little Orbit is informed and believes, and on that basis alleges, that Interplay has since cancelled its license of the Descent trademark to Descendent. That means Little Orbit has now lost the rights to this valuable trademark as a result of Descendent's repeated breaches of the Agreement and Terms Sheet. The loss of the Descent trademark also further devalues what work has been done to develop the Game.

//
//
//

**Defendants' Fraud and Material Breaches in Developing the Game**

33. Upon information and belief, contrary to Defendants' representations, Descendent did not have "sufficient personnel and resources to complete the Game in a timely manner."

34. Upon information and belief, contrary to Defendants' representations and commitment regarding the participation of key development personnel in the development of the game, certain key personnel left Descendent's employ either before or during production and were not replaced by equally competent personnel which created problems in completing the scope of game required by the parties' agreements.

35. Upon information and belief, contrary to Defendants' representations, Descendent was incapable of delivering a Game meeting Specifications agreed to between the Parties.

36. Upon information and belief, Descendent and Peterson fraudulently induced Little Orbit to commit to fund Descendent's payroll as part of the Terms Sheet Amendment with no actual intent or desire to provide concrete deliverables on specific dates, including a delivery date for the Final PC Version.

37. Upon information and belief, Descendent and Peterson purposefully made the false and fraudulent representations addressed herein with the express purpose of inducing Little Orbit to enter into the Development Agreement and later the Terms Sheet and to pay substantial sums to Descendent and others knowing the false and fraudulent representations would be acted upon by Little Orbit within this Judicial District and would cause harm to Little Orbit within this Judicial District.

**Defendants' Disparaging Statements**

38. Upon information and belief, based on the efforts of Little Orbit to promote the upcoming release of the Game, as well as Defendants' previous efforts, there was great anticipation in the gaming community for the release of the Game.

39. The repeated delays caused by Defendants' delays and ultimate failure to deliver a product meeting the agreed scope of the Game, resulted in the Game not being delivered as repeatedly promised which created curiosity in the gaming community as to what happened. As

a result, there was discussion among members of the gaming community on message boards and gaming communities regarding same.

40. On information and belief, Peterson, acting on his own behalf as well as in his capacity as the CEO of Descendent, made multiple false and disparaging statements about Little Orbit to the gaming community in an effort to cover up Defendants' failures and inability to meet the agreed scope and to cast blame for the failure of the Game to be published on Little Orbit.

41. Upon information and belief, Defendants' false statements disparaging Plaintiff have been copied and repeated/re-posted by others thereby expanding the spread of such false and disparaging statements.

42. Upon information and belief, Defendants' false statements disparaging Plaintiff include, but are not limited to, the following:

- Folks that say [Descendent] scammed are WAY off base, we worked for nothing, this is a publisher [Little Orbit] holding it hostage trying to get the rights from us, which we have even offered but not for free;
- it is our belief that they [Little Orbit] can't afford the marketing or console publishing and have parked it;
- we had good progress then they [Little Orbit] breached and are trying to snag the IP we own;
- they [Little Orbit] didn't market the game, they didn't properly test it, they constantly asked for changes - they didn't understand the project or market - they were trying to get it into Walmart instead of focusing on digital - so many ways they breached.....and finally they were unable to pay. We had to hold their hands so often on small things - they commissioned a video - for marketing, it was so unassociated with the game we had to rewrite the storyline, and manage new shots just to make it tie in;
- Little Orbit wanting to go full Arcade in January, was typical, they were getting builds for months and then decided to PIVOT based upon the lack of sales for Overload - and that the name Descent did not mean anything in the industry anymore

and that they would still need to spend on Marketing. The change in direction was typical of them, and they [Little Orbit] have a history of pulling stunts late to try to stiff devs [developers];

- Essentially they are trying to run us out of biz and take over the IP;
- we have offered to let them [Little Orbit] buy us out - they don't have the $$$, so consider that..if they can't even buy us out, how are they going to market, publish or finish the game? EXACTLY, they aren't.....so, here we are at an impasse - and those saying they fired us on Steam are way off base, you can't FIRE the IP holder - they just stopped paying, and breached their obligations hoping we would fold and give them everything and then trust them to share;
- We are here because of their [Little Orbit] decisions. They wanted a SAAS model, they needed our assistance on console, even though we were only contracted originally for the PC, they lost a console partner and a 2nd console team, they asked for a new ui like 4 times, they offered to do said UI then left it on us, they never tested properly, never marketed, and asked us to change to their completely new API in Decemberish;
- I mean as owner of the IP we wanted it as good as it could be and figured all of these changes they understood the impact to the schedule. Clearly they did not, they would just yell at us and tell us to work 7 days a week. Then we researched their [Little Orbit] history and found a pattern of behavior as projects ran into trouble;
- Too many times I have seen publishers kill a game late, take it to market without the original devs, and pocket all the money......right is right - If someone [Little Orbit] doesn't honor a contract signed recently, why would anyone trust they would honor one in the future? Once you start digging into some people's past and find similar situations and talk to others that have dealt with folks it clarifies a lot;

//
//
//

**COUNT I**
**(Breach of Contract)**

43. Plaintiff Little Orbit repeats and re-alleges Paragraphs 1 through 42 above as if fully set forth herein.

44. As set forth above, Little Orbit and Descendent Studios entered into the Development Agreement whereby Descendent Studios agreed to timely develop the Game in accordance with the specifications contained in the Development Agreement, in the Game Design Document and in the GAMESTORM.

45. Descendent Studios breached the Development Agreement by not meeting the milestones in a timely manner and also by not meeting the specifications required by the parties' agreements as to the scope of the Game.

46. Descendent Studios further breached the Development Agreement by failing to deliver the completed Game.

47. Descendent Studios breached the Development Agreement and the Terms Sheet by not meeting extended deadlines in a timely manner and also by not meeting the specifications required by the parties' agreements as to the scope of the Game.

48. Descendent also failed to provide the assignment of the Trademark License Agreement dated March 5, 2016, by and between Interplay Entertainment Corp. and Descendent as required under Section 9 of the Terms Sheet Amendment.

49. Descendent also violated Section 9 of the Agreement by making the above quoted statements to the public.

50. Little Orbit performed all, or substantially all, of the significant things that the Development Agreement and the Terms Sheet required Little Orbit to perform, except those things Little Orbit was excused from performing due to Descendent Studios' breach of the Development Agreement and Terms Sheet.

51. Little Orbit has been damaged as a result of Defendants' breach of contract in an amount which has not yet been ascertained but which is not less than $2,000,000.00 to be proven

at trial. Little Orbit has also suffered damages in the form of reasonably anticipated lost profits from the sale and/or licensing of the Game in excess of $5,000,000.

## COUNT II
### (Negligent Misrepresentation)

52. Plaintiff Little Orbit repeats and re-alleges Paragraphs 1 through 51 as if fully set forth herein.

53. In an effort to induce Little Orbit to enter into the Development Agreement, Peterson, Descendent Studios' CEO, expressly represented that Descendent Studios was capable of developing the Game and had a sufficient staff for doing so.

54. Defendants' representations and promises in this regard were critical and were relied upon by Little Orbit in proceeding to enter into the Development Agreement and continuing to pay Descendent Studios.

55. Defendants were, at all times, well aware of the significant costs and expenses associated with Little Orbit's investment in the development of the Game both including the sums being paid to Descendent Studios as well as to third parties.

56. Defendants' representations related to, among other things, its ability to adhere to and fully comply with all industry standards as well as the express specifications in the Development Agreement as well as to meet the delivery schedule for the completed Game.

57. At the time Defendants made those representations they either knew the representations were not true or made those representations under circumstances in which they ought to have known of their falsity.

58. Little Orbit justifiably relied upon Defendants' material misrepresentations and assurances, as, at the time Defendants made such representations, Little Orbit did not know of the falsity of Defendants' representations.

59. In deciding to enter into the Agreement with Defendants with respect to the development of the Game, Little Orbit relied upon Defendants' representations.

60. As a direct and proximate result of Little Orbit's justifiable reliance upon Defendants' negligent misrepresentations, Little Orbit has suffered and will continue to suffer

significant harm and damages, including, but not limited to, substantial lost profits, special damages and consequential damages stemming from the total failure of Defendants to deliver the Game as promised.  Defendants' negligent misrepresentations have caused damages in an amount which has not yet been ascertained but which is not less than the $2,000,000.00 Little Orbit invested in developing the Game pursuant to the Agreement and the Terms Sheet, in payments to Descendent as well as third parties, such amount to be proven at trial.  Little Orbit has also suffered damages in the form of reasonably anticipated lost profits from the sale and/or licensing of the Game in excess of $5,000,000.

## COUNT III
### (Fraud)

61.   Plaintiff Little Orbit repeats and re-alleges Paragraphs 1 through 60 as if fully set forth herein.

62.   In and around August through September 2017, Peterson, to induce Little Orbit to enter into the Development Agreement, intentionally misrepresented by telephone, in person and in electronic mail messages to, among others, Matt Scott of Little Orbit, that Descendent Studios:

   a. would deliver the Game in conformity with industry standards and customs and in conformity with the express specifications contained in the Development Agreement and the agreed upon scope of the Game;

   b. was capable of manufacturing and delivering the Game completed and ready to ship for a promised original release date of May 2018;

   c. had the key personnel with the appropriate skills and qualifications to deliver the Game in conformity with industry standards and customs and in conformity with the express specifications contained in the Development Agreement and the agreed upon scope of the Game;

63.   After failing to meet the original release date of May 2018 and then a second release date of November 2018, over the next year Defendants continued to promise to meet additional agreed dates and deliverable commitments but failed to do so.

64. For example, in and around October and November of 2018, Defendants represented Descendent:

   a. would be able to meet the extended delivery milestones so that the Game could be released in December of 2018.

   b. would be able to meet the further extended delivery milestones so that the Game could be released in February of 2019.

65. Descendent's repeated failures required Little Orbit to commit additional resources, in both internal as well as third party personnel, to try to assist Descendent and make up for its short comings.  This resulted in Little Orbit having to invest additional funds over and above what was committed in the Agreement in an effort to complete the Game.

66. Defendants knew that Little Orbit was heavily relying upon Peterson and Descendent's repeated representations, as described above, in agreeing to enter into the Development Agreement and, then later, the Terms Sheet.

67. At the time Defendants made the foregoing material representations and promises to Little Orbit, Little Orbit is informed and believes that Defendants knew Descendent was incapable of fulfilling such commitments and/or had no intention of performing under the terms of the Development Agreement and Terms Sheet and such representations were false when made.

68. Little Orbit acted in justifiable reliance upon Defendants' material misrepresentations and assurances as, at the time Defendants' made such representations, Little Orbit did not know that such representations were false, and could not, in the exercise of reasonable diligence, have discovered that such representations were false when made.

69. As a direct and proximate result of Little Orbit's justifiable reliance upon Defendants' fraudulent misrepresentations, Little Orbit has suffered significant and extensive damages and financial injury which has not yet been ascertained but which is not less than the $2,000,000.00 Little Orbit invested in developing the Game pursuant to the Agreement and the Terms Sheet, in payments to Descendent as well as third parties, such amount to be proven at trial. Little Orbit has also suffered damages in the form of reasonably anticipated lost profits from the sale and/or licensing of the Game in excess of $5,000,000.

## COUNT IV

### (Trade Libel/Commercial Disparagement)

70. Plaintiff Little Orbit repeats and re-alleges Paragraphs 1 through 69 as if fully set forth herein.

71. As set forth above, Defendants' have made multiple false statements disparaging Plaintiff to third parties in the gaming community.

72. Upon information and belief, the statements made by Defendants would be clearly or necessarily understood to have disparaged the quality and reputation of Plaintiff as a game developer and publisher and/or its products.

73. Upon information and belief, Defendants false statements constitute trade libel and commercial disparagement *per se*.

74. Upon information and belief, the statements by Defendants tended to disparage Plaintiff in the gaming community and were intended to harm Plaintiff's reputation as a developer and publisher of quality electronic games.

75. Defendants' statements are false, and Defendants made those statements with knowledge that they were false or with reckless disregard for their falsity.

76. Defendants' knew or should have known that Defendants' false statements would harm the reputation of Plaintiff as a developer and publisher of quality electronic games.

77. Little Orbit has suffered significant and extensive damages and financial injury as a result of Defendants' false statements which has not yet been ascertained but which is not less than $2,000,000.00 to be proven at trial.

## COUNT V

### (Declaratory Relief)

78. Plaintiff Little Orbit repeats and re-alleges Paragraphs 1 through 74 as if fully set forth herein.

//

//

79. Pursuant to the Development Agreement, Section 8.1, "All and any Intellectual Property Rights in the Publisher Materials shall belong to, vest in and be the exclusive property of Publisher and Developer shall do all such things as shall be necessary to effect the same."

80. Pursuant to the Development Agreement, "Publisher Materials" "Means all copy, content, graphics, images, software, data and other materials provided by Publisher (or by a third party on behalf of Publisher) to be incorporated into (or used in association with) the Game by Developer including without limitation all characters, titles, catch phrases, artistic representations, rules, names, and all trademarks, trade names, trade dress of Publisher embodied therein and all audio visual assets and pre-existing source code, game engines, computer code, art assets, graphics, content, text and sound files that are by provided by Publisher (or by a third party on behalf of Publisher) and those materials specifically described as Publisher Materials in the Development Schedule."

81. An actual controversy has arisen and now exists between Plaintiff and Defendants concerning their respective rights and duties in that Plaintiff contends it owns all of the Intellectual Property Rights in the Publisher Materials, whereas Defendants dispute this contention.

82. Plaintiff desires a judicial determination of the Parties' rights and duties, and a declaration as to Plaintiff's ownership of any and all Intellectual Property Rights in the Publisher Materials.

83. A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiff may ascertain its rights and duties regarding the Intellectual Property Rights in the Publisher Materials.

**PRAYER FOR RELIEF**

**WHEREFORE**, Little Orbit LLC respectfully requests that this Honorable Court enter Judgment in its favor and as against Defendants Descendent Studios Inc., and Eric Peterson ("Peterson"), as follows:

(a) For an award of damages in an amount to be proven at trial together with an award of prejudgment interest as permitted by law;

(b) For compensatory, contractual, consequential and incidental damages according to proof as against Defendant Descendent Studios Inc., due to its breaches of the parties' Agreements and understandings;

(c) For damages according to proof as against Defendants due to their negligent misrepresentations, intentional misrepresentations and/or fraud;

(d) For damages according to proof as against Defendants due to their disparaging statements regarding Plaintiff;

(e) For an award of punitive and exemplary damages in an amount commensurate with the egregious nature of Defendants Descendent Studios Inc. and Eric Peterson's conduct, and significant enough to deter Defendants and other like Defendants from pursuing similar conduct in the future;

(f) For Declaratory Relief declaring that Little Orbit is the owner of all intellectual property created by Defendants in connection with the game Descent: Underground, including but not limited to any and all Intellectual Property Rights in the "Publisher Materials" as defined in the Development Agreement;

(g) For all attorneys' fees as appropriate;

(h) For the costs of suit; *and*

(i) For such other and further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff Little Orbit LLC hereby demands a jury trial on all claims for relief triable by jury.

DATED: May 13, 2020     LAW OFFICE OF M. DANTON RICHARDSON

By:   /s/ M. Danton Richardson
M Danton Richardson
***Attorney for Plaintiff,***
Little Orbit LLC

# CERTIFICATE OF SERVICE

I hereby certify that on this 14th Day of May, 2020, the foregoing First Amended Complaint was filed with the Court's CM/ECF system and was served on the following counsel of record via email:

Michael C. Whitticar; VSB No. 32968
NOVA IP Law, PLLC
7420 Heritage Village Plaza, Suite 101
Gainesville, VA 20155
Tel:  571-386-2980
Fax:  855-295-0740
Email: mikew@novaiplaw.com
Counsel for Defendants

NADA I. SHAMONKI (SBN 205359)
MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone: (310) 586-3200
Facsimile: (310) 586-3202
Email: nshamonki@mintz.com
Counsel for Defendants

/s/ M. Danton Richardson
M. Danton Richardson