1  M. DANTON RICHARDSON (State Bar No. 141709)
   mdantonrichardson@yahoo.com
2  LEO E. LUNDBERG, JR. (State Bar No. 125951)
   leo.law.55@gmail.com
3  LAW OFFICES OF M. DANTON RICHARDSON
4  131 N. El Molino Ave., Suite 310
   Pasadena, CA 91101
5  *Attorneys for Plaintiff,*
6  LITTLE ORBIT LLC

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LITTLE ORBIT LLC, a California Limited Liability Company, | Case No.: 8:20-cv-00089-DOC-JDE |
| | Judge: Hon. David O. Carter |
| Plaintiff, | |
| vs. | **PLAINTIFF LITTLE ORBIT LLC'S REPLY IN SUPPORT OF MOTION TO SET ASIDE THE BINDING SETTLEMENT TERMS SHEET DUE TO DEFENDANTS' FRAUD AND FAILURE TO DELIVER THE ASSETS COVERED BY THE TERMS SHEET OR FOR ALTERNATIVE RELIEF AND FOR AN AWARD OF ATTORNEYS' FEES** |
| DESCENDENT STUDIOS INC., a Texas corporation, and ERIC PETERSON, an individual, | |
| Defendants. | |
| _____ | |
| DESCENDENT STUDIOS INC., a Texas corporation, | **[FILED UNDER SEAL PURSUANT TO ORDER OF THE COURT DATED APRIL 20, 2021]** |
| Counterclaimant, | **Date: July 26, 2021** |
| vs. | **Time: 8:30 a.m.** |
| | **Courtroom: 9D** |
| LITTLE ORBIT LLC, a California Limited Liability Company, | |
| Counter Defendant. | |
| _____ | |

1

## I. INTRODUCTION

It now appears that contrary to Defendants Descendent Studios Inc. ("Descendent") and Eric Peterson's ("Peterson") (collectively "Defendants") prior unequivocal statement that all of the game IP "no longer exists," the Defendants were somehow able to obtain and provide a copy of same to Plaintiff Little Orbit LLC ("Plaintiff" or "Little Orbit") on June 29, 2021, AFTER the filing of the instant Motion.

It is unfortunate that it took the filing of the instant Motion to prompt Defendants to turn over all of the Game IP assets covered by the subject Binding Settlement Terms Sheet ("BSTS"). Given Defendants' failure and refusal to turn over such assets – even recently making the claim such assets "no longer exist" – Little Orbit had no choice but to bring the instant Motion. It appears, however, that the recent production of the game IP to Plaintiff provides the licensed assets and the Motion is therefore moot on that score. But there are still several important issues that the parties still need the Court to address:

1)  The meaning of "revenues" as used in the BSTS and whether, if Defendants are correct in their interpretation, Plaintiff's consent was the result of a mistake as to the meaning of "revenues" and whether Plaintiff will suffer material harm if the contract is enforced using Defendants' claimed meaning of "revenues";

2)  The date the first payment should be due under the BSTS – Judge Early determined that the deadline would run from the date of the prior hearing – May 24, 2021 – given the parties failure to enter into a long form agreement which was the starting date under the BSTS; however, given Defendants' failure to turn over the Game IP until June 29, 2021, the payment obligation should not run until that date;

3)  The date on which the one year starts to run for Little Orbit to complete the development and commercially release the Game, which should be one year from the time Defendants finally produced the Game IP (June 29, 2021) or at the very earliest, May 24, 2021, the date that Judge Early determined Little Orbit's payment obligation should commence – the same date should likewise apply to the one year as well; and

4)  Plaintiff's right to attorneys' fees for having to bring this Motion, which is what prompted Defendants to finally provide Plaintiff with the licensed game IP.

Defendants spend a lot of time in their Opposition arguing their view of the merits of the underlying dispute and argue without any evidence that Little Orbit cannot make the payments provided for in the BSTS.  What Defendants fail to disclose is that Little Orbit offered to place the first required payment in their counsel's trust account pending the parties efforts to resolve this dispute but Defendants refused that offer, forcing the bringing of the instant Motion given the deadline to make that first payment.  Reply Declaration of M. Danton Richardson, ¶ 4.  As set forth in the Motion, given Defendants' failure to turn over all of the game IP assets and their resent claim that such assets "no longer exists" Plaintiff had no choice but to bring this Motion.

Defendants admit that counsel discussed the filing of this Motion but argue that the grounds were not discussed and Plaintiff did not wait seven days.  However, the failure of Defendants to maintain and be able to turn over the game IP assets was expressly discussed as being a failure of consideration.  Defendants' response was they had not such obligation and therefore no agreement could be reached on that point.  Moreover, given the pendency of the payment deadline, one which should not be required if there was a failure of consideration as was the indications at the time, Plaintiff felt it was necessary to file the Motion by the payment due date of June 23, 2021.  Richardson Reply Decl., ¶ 3.  The Court should exercise its discretion to consider the motion even if there was a failure to meet and confer, which there was no such failure, as same would have been futile.

## II.    ARGUMENT

### A.    Defendants' Have Now Apparently Finally Delivered – Only as a Result of the Filing of the Instant Motion - the Game IP Assets Covered by the BSTS

Defendants do not deny nor address any of the authorities cited by Plaintiff providing that a party may rescind a contract based on a failure of consideration.  Rather, Defendants instead argue (1) they are not obligated to provide Little Orbit with a copy of the game IP covered by the BSTS because there is no specific provision requiring such delivery; and (2) they have turned over all of the game IP to Little Orbit, although Defendants fail to mention that only happened on June 29, 2021 – AFTER the filing of the instant Motion.

1. **Defendants Expressly Represented to Plaintiff "the Project History No Longer Exists" Which is What Understandably Prompted this Motion**

Defendants do not deny that the BSTS provides a license to Little Orbit covering "all game IP" but yet, with apparent conviction, Defendants still claim they were never obligated to turn over a copy of all of the licensed assets to Little Orbit because the BSTS did not expressly provide for such a turn over. Worse, however, Defendants also disingenuously claim they "never told Little Orbit that the prior versions of the game software or artwork or other deliverables were destroyed" [Opp at 5:15-16] but that argument is merely playing word games. While Mr. Peterson never used the word "destroyed" that is effectively what Mr. Peterson expressly stated in his email to Mr. Scott dated June 15, 2021, which prompted the subject Motion:

> That [the full source code repository with the entire project history] *doesn't exist*- Little Orbit needs no such thing, they have the source code. *There is no project history*, when Little Orbit breached their obligations, *the servers could no longer be continued*.
>
> *The project history no longer exists.*

See Scott Decl., Exhibit D (emphasis added). Little Orbit submits that it is a fair conclusion to refer to something as being "destroyed" which once existed, but which no longer exists because "servers could no longer be continued." Most notably, Defendants do not challenge the fact Mr. Peterson made the foregoing statements instead choosing to play word games by the foregoing conclusory denial rather than actually addressing the substance at issue.

2. **The License Provided to Little Orbit by the BSTS Implicitly Would Require Defendants to Provide Little Orbit with a Copy of "All Game IP" as that is What is Covered by the License**

It is most of absurd of Defendants to claim that they are not obligated to provide Little Orbit with a copy of the game IP where the very purpose of the BSTS was a license covering "all game IP." It should be obvious that a license of intellectual property assets is worthless without providing access to those assets and it is not only absurd but most disingenuous of Defendants to argue otherwise. In fact, whether the agreement expressly requires such a

turnover, the duty of good faith and fair dealing applicable to all contracts in California certainly would.

Further, it appears that Defendants believe that because Little Orbit had a copy of the game source code as it existed at some point in time prior to the termination of the Development Agreement that somehow excuses Defendants from turning over all of the "game IP" as covered by the BSTS. Defendants' belief is betrayed by the fact that the BSTS does not state that it only provides Little Orbit with a license which only covers the source code that was provided to Little Orbit prior to the termination. The BSTS could have certainly stated as much if some prior version of the source code and only that source code was all that was supposed to be covered by the parties' agreement. But there is no such limitation. Rather, the agreement is clear and express and refers to "all game IP" which clearly includes everything ("all"), not simply the source code. This is especially important here because the very purpose of the license was to allow Little Orbit to complete development of a partially completed game, not simply release an already completed project. In order to complete the development of the game one needs the "building blocks" that have been created thus far so those building blocks can be used to not only complete the initial PC (computer) based version of the game but also so such assets can be re-configured to also work on other gaming platforms. As the BSTS provides at paragraph

In fact, here it must be remembered that the BSTS is a summary "terms" sheet spelling out the key deal points. It does not go into any great detail nor does it contain very many specifics – just the key terms including that Little Orbit received a license covering "all game IP" for the express purpose of completing the development of the game and releasing it commercially, not only in PC form (*i.e.*, for personal computers) but also all other gaming platforms such as Sony's PlayStation and Microsoft's Xbox as well as online.

Defendants argue "that their deliverables under the BSTS were expressly stated and limited therein. They included and were limited to 'pre-order data, Kickstarter data, and early backer data.'" [Opp at 3:2-4] But that is not the case as those items were listed because they would not otherwise be included in a license of the "game IP." The simple fact is that a license

of "all game IP" implicitly requires a turnover of all such "game IP." Such a license does not implicitly require a turnover of "pre-order data, Kickstarter data, and early backer data" as those items do not naturally constitute part of the game IP. Therefore it was expressly necessary to separately spell out an obligation to turn over such data.

### 3. It Appears Defendants Have – After the Filing of the Instant Motion – Finally Provided Little Orbit with Copy of the Game IP Assets Covered by the License

It does now appear that Defendants have belatedly provided a copy of the game IP assets which will allow Little Orbit to complete development of the game. But it is important to note that only occurred on June 29, 2021, after the filing of the instant Motion.

### 4. The Deadline for Little Orbit the Game Should Run from When Defendants Finally Turned Over the Licensed Assets

Paragraph 13 of the BSTS provides that "If Little Orbit does not release and sell game in *1 year from signing written memorialization*, Descendent may terminate the license, Descendent can do the game, pays Little Orbit ▇▇ of revenues up to total payout cap of ▇▇▇▇▇▇ (emphasis added). Given the months of delay in providing a copy of the licensed assets, the time for Little Orbit to commercially release the PC version of the game should be deemed to run from the delivery date of the licensed assets – June 29, 2021.

As Judge Early found: "In fairness, as the parties did not execute a 'further, more detailed written memorialization,' to the extent the Settlement Agreement used the phrase 'within [__] days of signing [a] written memorialization' as a triggering event, such triggering date shall be the date of this Report." Report and Recommendation dated May 24, 2021.[1] At the very least,

---

[1] Defendants inexplicably claim the first settlement payment "was due six months ago" [Opp at 8:15] (obviously trying to make Little Orbit look bad for allegedly not having made such payment six months ago) but that clearly is not the case. Rather, the first payment was due "within 30 days of signing written memorialization." BSTS, ¶ 1.

that same logic should apply to the running of Little Orbit's deadline to complete the (PC version) of the game as that deadline likewise was expressly set to start on the signing of a long form agreement which has never happened.

  **B. If the Court Finds that the Applicable Definition of Revenues Prevents Little Orbit from Making Gaming Industry Standard and Customary Deductions in Calculating Royalties, Such as the Type of Deductions Spelled out in the Parties' Development Agreement, then the Court Should Vacate the Settlement Based on the Clear Error on the Part of Little Orbit Which Would Cause it to Suffer Substantial and Material Harm**

    **1. The Court Should Determine the Meaning of "Revenues" as used in the BSTS and Should Find that the BSTS Allows for the Deduction of Industry Standard Deductions before Calculating Royalties**

  Plaintiff's consent to the Settlement Terms Sheet was given under the belief that the term "revenues" meant revenues after industry standard and customary deductions as already agreed to between the parties in the Development Agreement. After all, the parties were negotiating to resolve a dispute regarding that very agreement and it provided the foundation for the parties' negotiations. However, if Defendants' position is adopted by the Court, then Plaintiff's consent was given by mistake (*i.e.,* believing that customary deductions could be made before determining the parties' revenue split) and Plaintiff will suffer substantial and material harm if the contract is enforced without allowing for customary deductions. Scott Decl., ¶¶ 16-22. This is so because such a meaning would greatly change the amounts that have to be paid to Defendants, which forcing Plaintiff to bear all of the expenses, and would kill any hope of Plaintiff ever recovering its investment into the Game.

  In essence, Defendants' interpretation of "revenues" not only has no relation with the terms of the Development Agreement in dispute but is totally contrary standard industry practices. In fact, under Defendants' interpretation of "revenues" Defendants would reap up to ▅▅ of the benefits from sales of the game without having to bear any of the customary costs that go into producing those revenues. In such event, Plaintiff would have to bear all of the costs out of its share of royalties, which is wholly inequitable and inconsistent with the original

agreement and the standard in the gaming industry.  Scott Decl., *Id*.  See also Fed. R. Civ. P. 60(b)(1); and *Habitat Tr. for Wildlife, Inc. v. City of Rancho Cucamonga*, 175 Cal.App.4th 1306, 1332-33 (2009) ("A contract may also be rescinded if the consent of the rescinding party was given by mistake. (Civ. Code, § 1689, subd. (b)(1).)  The party attempting to void the contract as a result of mistake must also show that it would suffer material harm if the agreement were enforced, though that need not be a pecuniary loss.").

### 2. Standard Dictionary Definitions Allow for "Revenues" to Mean "Income after Expenses"

Defendants continue to argue that the meaning of "revenues" should be interpreted based on "its common dictionary definition" [Opp at 10:16-17) totally ignoring the parties' prior course of conduct, the fact the prior Development Agreement was the starting point for the parties' negotiations and standard industry practice.  But even resorting to "common dictionary definitions" does not support Defendants' argument that the use of "revenues" means no deductions can be made.

Defendants' argument regarding the meaning of "revenues" being "gross revenues" and not allowing for any deductions is based on their cherry-picking one aspect of the definition from Black's Law dictionary - "income from any and all sources; gross income or gross receipts" – notwithstanding the fact that no one consulted Black's Law Dictionary in putting together the terms used in the BSTS.  Most importantly, however, the definition of "revenue" from Mirriam-Webster's Dictionary includes the following: "the gross income returned by an investment."  (Black's contains a similar alternative meaning: "The periodic yield or interest from investment.").

Here that "investment" would include the amounts invested into the game and its ongoing marketing, sales commissions, hosting costs, and other expenses. Additionally, that same definition from Mirriam-Webster's also makes clear that "profit" is a synonym for "revenue". Likewise, "income" is a synonym for "revenue."  See Scott Decl., ⁋ 12 and Request for Judicial Notice, Exhibits A - D.

The problem here is the meaning of "revenues" is still not clear. Defendants have focused on Magistrate Early's finding the term is not ambiguous to conclude Defendants' proposed meaning must be the correct meaning, but that totally ignores the rest of what Magistrate Early said:

> THE COURT: It's not -- that dispute is not ripe for me. Okay? Come back to me, if you need to, if the first payment is not made. I think revenue -- the meaning of it is clear. It's not ambiguous. ***It was clear from the context of the agreement itself, and from the parties course of dealing, it was not unclear.***

Transcript, 10:19-24 (Peterson Decl., Exhibit C).

Little Orbit submits that "the parties course of dealing" would include the fact the Development agreement which provided for royalties to be determined after certain industry standard costs were deducted.

Defendants argue that the term "revenues" as used in the BSTS is different that the term "net sales" as used in the Development Agreement and while that is technically true (and raises the question whethere Defendants purposefully used a different word notwithstanding the context of the parties' negotiations just to be able to make their current argument) the parties did not cross check the words used in the BSTS with the specific words used in the Development Agreement in the rush to put the key deal points to paper. The key is the context of the parties course of dealing, including how royalties were calculated in the Development Agreement, and standard industry customs and practices.

### 3.     Settlement Agreements are Not "Strictly Construed"

Contrary to Defendants' unsupported claim, settlement agreements are not "strictly construed." In fact, they are treated as any other contract and are subject to the same defenses including failure of consideration and mistake. This principle was forth in the Motion and has not been rebutted by Defendants:

> "A settlement agreement is a contract, and the legal principles which apply to contracts generally apply to settlement contracts.

9

[Citation.]" *Sully-Miller Contracting Co. v. Gledson/Cashman Constr., Inc.*, 103 Cal.App.4th 30, 35-36, 126 Cal.Rptr.2d 400, 403 (2002) (quoting *Weddington Productions, Inc. v. Flick*, 60 Cal.App.4th 793, 810-11, 71 Cal.Rptr.2d 265(1998).)

Motion at 9:27-10:4.

### C. Little Orbit Did Not Argue, Nor Has the Court Addressed, the "Mistake" at Issue in this Motion

Defendants argue that Little Orbit's "mistake" argument was previously made and already rejected by the Court. However, Little Orbit did not previously argue mistake but that there was no meeting of the minds – "Under California contract law, where there has been no meeting of the minds there is no contract." Opposition at 3:16-17. It is the "no meeting of the minds" argument that was rejected by the Court – "The parties had a 'meeting of the minds' regarding the meaning of the terms used in the Settlement Agreement, with such terms being unambiguous in the context in which they were used." Report and Recommendation dated May 24, 2021, Finding No. 3 (dkt 79). Additionally, the current Motion is based on Fed. R. Civ. P. 60(b) and California Civ. Code § 1689(b)(1), neither of which were addressed by Little Orbit in the subject prior opposition.

### D. Defendants' Should be Ordered to Pay for Plaintiff's Attorneys' Fees in Connection with this Motion

Because Defendants failed to turn over "all game IP" and Defendants' statements to Little Orbit that such game IP "no longer exists" Defendants should pay Plaintiff's attorneys' fees in having to bring this Motion. It was Defendants' failure to comply with the BSTS by turning over the licensed game IP assets which prompted the filing of this Motion and that failure is not excused by Defendants' belatedly producing the licensed assets only after this Motion was filed.

### III. CONCLUSION

Defendants' belated turn-over of the game IP assets does not excuse their previous failure and refusal to provide Little Orbit with a copy of those assets months ago. In fact, that failure and refusal – even going so far as to claim such assets "no longer exist" was clearly in bad faith, in breach of Defendants' duty of good faith and fair dealing and forced Plaintiff to incur the costs necessary to bring this Motion. Accordingly, Plaintiff should be awarded its fees for bringing the instant Motion. This Court should also find that Little Orbit's obligations under the BSTS did not start to run until those assets were provided to Little Orbit on June 29, 2021.

Additionally, the Court should determine the meaning of "revenues" as used in the BSTS because if Defendants are correct in their interpretation, then the BSTS was clearly entered into by Little Orbit by mistake and Little Orbit would suffer substantial and material harm if the contract is enforced without allowing for customary deductions and the Court should, in that event, set aside the BSTS.

DATED: July 12, 2021         **LAW OFFICES OF M. DANTON RICHARDSON**

By: ___/s/ M. Danton Richardson___
           M Danton Richardson

*Attorney for Plaintiff,*
Little Orbit LLC

# CERTIFICATE OF SERVICE

I hereby certify that on this 12th Day of July, 2021, the foregoing **PLAINTIFF LITTLE ORBIT LLC'S REPLY IN SUPPORT OF MOTION TO SET ASIDE THE BINDING SETTLEMENT TERMS SHEET DUE TO DEFENDANTS' FRAUD AND FAILURE TO DELIVER THE ASSETS COVERED BY THE TERMS SHEET OR FOR ALTERNATIVE RELIEF AND FOR AN AWARD OF ATTORNEYS' FEES** was filed with the Court's CM/ECF system and was served on the following counsel of record via email:

Michael C. Whitticar; VSB No. 32968
NOVA IP Law, PLLC
7420 Heritage Village Plaza, Suite 101
Gainesville, VA 20155
Tel:   571-386-2980
Fax:  855-295-0740
Email: mikew@novaiplaw.com
Counsel for Defendants

NADA I. SHAMONKI (SBN 205359)
MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone: (310) 586-3200
Facsimile: (310) 586-3202
Email: nshamonki@mintz.com
Counsel for Defendants

                                                   /s/ M. Danton Richardson
                                                    M. Danton Richardson