NADA I. SHAMONKI (SBN 205359)
nshamonki@mintz.com
**MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.**
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone:  (310) 586-3200
Facsimile:   (310) 586-3202

MICHAEL C. WHITTICAR (*admitted pro hac vice*)
mikew@novaiplaw.com
**NOVA IP LAW, PLLC**
7420 Heritage Village Plaza, Suite 101
Gainesville, VA 20155
Telephone:  (571) 386-2980
Facsimile:  (855) 295-0740

Attorneys for Defendant/Counterclaimant
DESCENDENT STUDIOS INC. and
Defendant ERIC PETERSON

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LITTLE ORBIT LLC, a California Limited Liability Company,<br><br>                    Plaintiff,<br><br>vs.<br><br>DESCENDENT STUDIOS INC., a Texas corporation, and ERIC PETERSON, an individual,<br><br>                    Defendants. | Case No. 8:20-cv-00089-DOC-JDE<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' SECOND MOTION TO ENFORCE THE BINDING SETTLEMENT TERMS SHEET, FOR A MONEY JUDGMENT, AND FOR AN AWARD OF ATTORNEYS' FEES**<br><br>**[REDACTED VERSION OF DOCUMENT FILED UNDER SEAL PURSUANT TO ORDER OF THE COURT DATED APRIL 20, 2021]** |
| DESCENDENT STUDIOS INC., a Texas corporation,<br><br>                    Counterclaimant,<br><br>vs.<br><br>LITTLE ORBIT LLC, a California Limited Liability Company,<br><br>                    Counterdefendant. | Date:       August 23, 2021<br>Time:        8:30 a.m.<br>Courtroom: 9D<br><br>Judge: Hon. David O. Carter<br><br>Complaint Filed:    1/16/2020 |

# **TABLE OF AUTHORITIES**

**Page**

I. FACTS............................................................................................................. 1

II. ARGUMENT.................................................................................................. 4

III. LITTLE ORBIT IS NOT ENTITLED TO ANY EXTENSIONS OF TIME NOR TO ATTORNEYS' FEES ...................................................................... 10

IV. STATUS OF NEGOTIATIONS ................................................................... 12

V. CONCLUSION ............................................................................................. 13

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Coker Equipment Co., v. Witting,*
  366 Fed. Appx. 727 (9th Cir. 2010) ................................................................. 13

*Ekland Marketing Company of California, Inc. v. Lopez,*
  2007 U.S. Dist. LEXIS 48391 (E.D. Cal. June 5, 2007) .................................... 8

*Price v. U.S. Monolithics, LLC,*
  2005 U.S. Dist. LEXIS 53065 (S.D. Cal. 2005) ............................................... 13

*Vectren Communications Services v. City of Alameda,*
  2009 U.S. Dist. LEXIS 72811 (N.D. Cal. August 18, 2009) .............................. 8

**California Cases**

*Berman v. Bromborg,*
  56 Cal. App. 4th 936 (2d. Dist. Ct. App. 1997) .................................................. 5

*Branley v. Crosby Research Foundation, Inc.,*
  73 Cal. App. 2d 103 (1st Div. Ct. App. 1946) .................................................... 8

*Donovan v. RRL Corp.,*
  26 Cal. 4th 261 (Cal. Sup. Ct. 2001) ................................................................... 6

*Rodriguez v. Oto,*
  212 Cal. App. 4th 1020 667, 672 (2013) ............................................................ 5

*Vaillette v. Fireman's Fraud Ins. Co.,*
  18 Cal. App. 4th 680 (4th Dist. Ct. App. 1993) .................................................. 5

*Wolf v. Walt Disney Pictures & Television,*
  162 Cal. App. 4th 1107 (2nd Dist. Ct. App. 2008) ............................................. 8

**California Statutes**

Cal. Civ. Code § 1636 ............................................................................................. 5

Cal. Civ. Code § 1638 ............................................................................................. 5

Cal. Civ. Code § 1655 ............................................................................................. 8

Cal. Civ. Code § 1656 .................................................................................................8

Cal. Comm. Code § 2306(2) ......................................................................................9

**Other Authorities**

Local Rule 7-3 ..........................................................................................................12

Brian A. Garner, Black's Law Dictionary (11th Ed. 2019) .................................5, 7

Restatement (Second) of Contracts § 153 .................................................................6

Restatement (Second) of Contracts § 251 ...............................................................13

## I. FACTS

1. This second motion to enforce the BSTS is necessary due to Little Orbit's breach of the BSTS, most recently by failing to make the settlement payment which was due (once again) on June 23, 2021, and also by failing to provide adequate assurance of due performance upon demand.

2. Little Orbit admits that it now has all of the game assets purportedly necessary to complete the game, but it still has failed to make the first settlement payment.

3. The BSTS was signed on November 17, 2020, almost eight months ago. It required three payments from Little Orbit ("LO") to Descendent, two of which were due within 120 days of signing the original BSTS or first written memorialization. Neither of these first two payments has been made, and Little Orbit has plainly stated that it has no intention of making any of the agreed upon monetary settlement payments. (Ex. A to Peterson Declaration). (Peterson Declaration ¶ 3).

4. Because Little Orbit has failed for the past seven months to make any of the agreed upon settlement payments, and again skipped the June 23, 2021 payment date as extended by the court, Descendent is gravely concerned that Little Orbit lacks the funds to pay Descendent, is stalling for time, and lacks the intent and ability to make the settlement payments.[1] This is especially concerning given the projected $1 million or more in costs and expenses that will be needed for Little Orbit to adequately complete and market the game. The Defendants' concern is heightened by the fact that an Experian Credit Report shows that Little Orbit has a "high risk" business credit score, and keeps less than ▮▮▮▮▮ in the bank. (Ex. B to Peterson Declaration). (Peterson Declaration ¶ 5)

---

[1] The email attached as Exhibit A to the Peterson Declaration, like the most recent declaration from Little Orbit's Matthew Scott, also strongly indicates that Little Orbit plans to skip all three agreed-upon settlement payments and to try to covertly impose its own misguided and erroneous definition of "Revenues."

-1-

5. Descendent requests the Court to order Little Orbit to pay (at least) the first settlement payment plus $7,500.00 in attorneys' fees to the Defendants. In addition, pursuant to Section 4 of the BSTS, Little Orbit should be ordered to pay Descendent ▆ percent of the first ▆▆▆ in revenue or gross income received after Little Orbit defaulted on its payment obligation on June 23, 2021 (originally on December 17, 2020).

6. The ▆▆ split provided for in Section 4 of the BSTS is <u>not</u>, however, Descendent's sole remedy for Little Orbit's complete failure to make **all three payments** required under the Binding Terms Sheet, at Sections 1 through 3.

7. Section 4 of the BSTS simply provides as follows:

> 4. If any <u>payment</u> <u>not made</u> <u>on time</u>, LO pays Descendent ▆ percent of the first ▆▆▆ in revenues after default.

(Docket No. 48-1) (emphasis supplied).

8. This was expressly stated as a remedy for any one "<u>payment</u>" (singular) that was not made "<u>on time</u>." It was never stated nor agreed to be Descendent's <u>sole or exclusive remedy</u> for any one or more <u>payments</u> (plural) that are not made <u>at all</u>, and especially not for all three payments not being made <u>at all</u>. Little Orbit has tried to stretch the language of Section 4 beyond its clear logical and plain grammatical meaning, because Little Orbit lacks the intention and also apparently the funds necessary to make the required settlement payments. However, it is clear that Section 4 was intended to address only the *timing* of payments, and not to establish an exclusive remedy for Little Orbit failing to make one or more payments <u>ever or at all</u>. (Peterson Declaration ¶ 6).

9. It should be noted that, if the game sells well, then the early ▆▆ split of ▆▆▆▆ provides Descendent with no additional funds at all. Rather, it only improves cash flow and helps Descendent get *part* of the back-end ▆▆ revenue split paid *sooner*. This potential "early" ▆▆ split is exactly the same as Descendent's ▆▆ back-end split on ▆▆▆▆ from the later revenue tranches.

-2-

1  Descendent did not intend to and would not have bargained away a minor advance
2  in cash flow as the only and exclusive remedy for Little Orbit skipping, keeping and
3  pocketing ▉▉▉ in settlement payments. This is especially true given that
4  Little Orbit filed its frivolous claims in the original litigation after Little Orbit: (A)
5  ran out of money, (B) shorted its payment due to Descendent, (C) apologized for
6  shorting the payment, (D) admitted that Little Orbit had run out of money, and then
7  (E) sued the Defendants shortly after they formally notified Little Orbit of its
8  payment default. (Peterson Declaration: Exs. C and D). (Peterson Declaration ¶ 7).

9      10. Matt Scott's reply declaration contains many clear falsehoods. The most
10 obvious and material of these, which Judge Early will hopefully recognize and
11 remember, is that Little Orbit purportedly bargained for the right to skip all three
12 settlement payments in exchange for only the ▉▉ splits on the first ▉▉ in
13 revenues. That was never discussed nor agreed upon. The ▉▉ split on the first
14 $▉▉ in revenues was never discussed or deemed to be Defendants' only or
15 exclusive remedy for payment breaches as to all three payments, and Section 4 of
16 the BSTS makes this a remedy only for any single "payment" not being made "on
17 time." It does not address, and was never discussed as applying to, the situation
18 where all three payments are not made at all. While the parties discussed that Little
19 Orbit may have trouble making the first settlement payments on time, they never
20 discussed or agreed that Little Orbit could skip all three payments nor that the ▉▉
21 revenue split would be the Defendants' only or exclusive remedy. (Peterson
22 Declaration ¶ 9).

23     11. The fact that Matt Scott would swear to this demonstrably false
24 statement (Scott Declaration ¶ 10) shows the fraudulent intent of Little Orbit in that
25 it obviously lacked the intent to make the three settlement payments required by the
26 BSTS.

27     12. Because Little Orbit has missed the first three payment due dates, and
28 given its prior history of defaulting on debts to Descendent, the Defendants have

-3-

demanded adequate assurance of due performance of Little Orbit's financial and development obligations under the BSTS. (Peterson Declaration Ex. E). (Peterson Declaration ¶ 10).

13. Specifically, the Defendants are concerned that Little Orbit lacks and has always lacked the funds necessary to make the settlement payments and complete development of the game. That concern is based in part on an Experian Credit report, which puts Little Orbit into the "high risk" category and further indicates that Little Orbit keeps less than $▮ in its bank account, which is far less than the $1 million or more necessary to complete the game and pay the Defendants. (Ex. B: Peterson Declaration). (Peterson Declaration ¶ 11).

14. Therefore, the Defendants have demanded, but have not received, the Little Orbit bank statements and its financial accounting software and reports from November 1, 2020 through the present, plus disclosures as to the status of Little Orbit's fund raising efforts and development efforts. By not providing the requested financial data, development status disclosure, and financing status disclosure as adequate assurance, Little Orbit has committed yet another material breach of the BSTS. (Peterson Declaration ¶ 12).

## II. ARGUMENT

As the Court previously noted, the "revenues" of which Descendent is entitled to ▮ percent of means "income from any and all sources; gross receipts."

> I think revenue - the meaning of it is clear. It's not ambiguous…..It appears to me that the--- there has been an effort made by Plaintiff to create an ambiguity where there was none….

(Peterson Declaration Ex. F at pp. 10-11).

These issues are objectively determined based on the parties' "objective manifestations" of assent and intent made at the time of contracting. This rule exists primarily to prevent and foreclose the type of backsliding and re-negotiating which Little Orbit is improperly attempting in this case.

> California recognizes the objective theory of contracts. It is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation.
>
> …
>
> Thus, evidence of undisclosed subjective intent of the parties is irrelevant to determining the meaning of contractual language. Rather, it is the outward manifestation or expression of assent which is controlling. With respect to the interpretation of a written settlement agreement, one court has stated that the true, subjective but unexpressed intent of a party is immaterial and irrelevant.

*Berman v. Bromborg,* 56 Cal. App. 4th 936, 948, 65 Cal. Rptr. 2d. 777, 783 (2d. Dist. Ct. App. 1997), citing and quoting, (among others) *Vaillette v. Fireman's Fraud Ins. Co.,* 18 Cal. App. 4th 680, 686, 690, 22 Cal Rptr. 807, 810 (4th Dist. Ct. App. 1993).

"A signature on a written contract is an objective manifestation of assent." *Rodriguez v. Oto*, 212 Cal. App. 4th 1020, 1027, 151 Cal Rptr. 3rd 667, 672 (2013). "If the terms are unambiguous there is ordinarily no occasion for additional evidence of the parties' intent." *Id.* Their "actual intent," for purposes of contract law, "is that to which they manifested assent by executing the agreement." *Id.*

Thus, a party's secret, unexpected subjective interpretation of words is irrelevant in interpreting a contract:

> Ordinarily, the words of the document are to be given their plan meaning and understood in their common sense; the parties' expressed objective intent, not their unexpressed subjective intent, governs.
>
> The true, subjective, but unexpressed intent of a party is immaterial and irrelevant.

*Vaillette*, 18 Cal. App. 4th at 686, 690, 22 Cal Rptr. at 810 (4th Dist. Ct. App. 1993); Cal. Civ. Code §§ 1636, 1638. Here, the plain meaning and dictionary definition of "revenue" is "income from any and all sources, gross receipts."[2]

---

[2] According to Black's Law Dictionary, the very first definition of "Revenue" is "income from any and all sources; gross income or gross receipts." B.A. Garner, Black's Law Dictionary, p. 1577 (11th Ed. 2019).

In addition, there is no reason that paying Defendants a percentage of revenues or gross income would be unconscionable, as the BSTS was carefully negotiated by skilled counsel at arm's length, Defendants own the relevant intellectual property to the game, and royalties are typically based on revenues and not on margins or profits, which are subjective and easy to manipulate. (Peterson Declaration ¶ 13).

Furthermore, Defendants' evidence would have clearly shown that Little Orbit's payment defaults and many unnecessary changes and failures to perform[3] were responsible for the cost overruns and delays based on which Little Orbit wrongfully terminated the Original Contracts in February of 2019. (*See* Exs C & D). (Peterson Declaration ¶ 14). Furthermore, the very same definition of "revenues" will apply to Descendent if - as now seems likely eight months into Little Orbit's one-year deadline - the development rights revert back to Descendent in four months pursuant to Section 13 of the BSTS. Therefore, there is no basis for setting aside the BSTS based on Little Orbit's unilateral mistake nor as being unconscionable. *See Donovan v. RRL Corp.*, 26 Cal. 4th 261, 280-282 (Cal. Sup. Ct. 2001); Restatement (Second) of Contracts § 153.

Little Orbit's claim that it construed "revenue" not by its common dictionary definition but rather to be the same thing as "Net Sales" under the Development Agreement is untrue, illogical and objectively baseless. First, the Development Agreement never defined or used the terms revenues or profits, but rather the very distinct and different term "Net Sales."

Second, Little Orbit breached and then terminated the Development Agreement and the subsequent terms sheet addendum (the "Original Contracts") long ago in February of 2019, which is what caused this litigation, just after

---

[3] Like failing to complete the application program interface "API" that Little Orbit demanded and promised to complete itself but then failed to complete. Because Little Orbit never completed the API, breached its payment obligations to Descendent, and wrongfully terminated the Original Contracts, Descendent never had any obligation to convey the trademark license because the game was never completed or released. (Peterson Declaration ¶ 14 footnote 2).

Descendent notified Little Orbit of its payment default because Little Orbit admittedly ran out of money and could not pay Descendent. (Exs. C & D : Peterson Declaration ¶ 15).

Third, the BSTS provided for "Mutual General Releases" (p. 2, ¶ 19), which completely cancelled and novated the Original Contracts.

Fourth, the parties' relationship under the BSTS is not based on and looks nothing like their relationship under the Development Agreement. To the contrary, under the BSTS, Descendent assumed absolutely no responsibility for performing any development work or services after transferring (only) certain discrete, limited items of customer information to Little Orbit. (BSTS ¶ 10).

The BSTS was a completely different animal from the terminated Development Agreement. The BSTS simply and objectively was not a continuation of the Development Agreement in whole or in part. There is no objectively logical or accurate reason that Little Orbit could have reasonably expected the meaning of a word not used or defined in the Development Agreement (Revenues) to have the same meaning as the Development Agreement's very different term (Net Sales) when "Revenues" was used in the very different BSTS.[4] In addition, the parties simply did not base the payment splits in the BSTS on the Development Agreement. Rather, they were the product of back-and-forth dickering and negotiations. (Peterson Declaration ¶ 16).

There is no standard definition or set of deductions from royalty income or net sales in game software development contracts. In any event, the contract and deal

---

[4] Oddly, Little Orbit has argued at length about the meaning of the word "profits" and the parties' failure to discuss, "profits." Tellingly, "profits" is not a word that was ever used in the BSTS nor in the Development Agreement. Like "Net Sales," "profits" has a very different definition and connotation than revenues, as "profits" means profits or income after subtracting costs and operating expenses from "revenues." See Brian A. Garner, Black's Law Dictionary, p. 1463 (11th Ed. 2019) ("profit" means "the excess of revenues over expenditures in a business transaction; GAIN."). Once again, Little Orbit and its counsel have confused "Revenues" with other, very dissimilar words and concepts.

-7-

that the parties were negotiating in November of 2020 was not a development agreement but a settlement agreement – one which left the Defendants with no obligation to deliver anything nor to provide any further services (other than delivering a few discrete items of customer data). (BSTS § 10) (Peterson Declaration ¶ 18).

In short, as judged by the plain language dictionary definition of the words they chose and used, as properly judged by their objective manifestations of assent and meaning, and properly disregarding post-hoc subjective statements of Little Orbit's inaccurate, baseless, purported secret meaning of "Revenues," the parties agreed that Defendants would receive royalties and payments based on a percentage of revenues, meaning gross income from sales and licensing.

The excuses given by Little Orbit for not paying are simply and totally without merit. Little Orbit has trotted out one set of purportedly "crucial" missing deliverables after another as its excuse for not paying what it owes to Descendent. It is important to note that Little Orbit did not complain about any of these allegedly missing purported deliverables for almost five (5) months after it was supposed to have started development in November of 2020.  (Peterson Declaration ¶ 19).

By not starting development for 8 months after the BSTS was signed, (*see* Matt Scott Declaration ¶ 3), Little Orbit materially breached its good faith best efforts obligations, as an exclusive licensee, to deliver and market the game. *See Branley v. Crosby Research Foundation, Inc.*, 73 Cal. App. 2d 103, 112 (1st Div. Ct. App. 1946), citing Cal. Civ. Code §§ 1655,1656. *See also Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1120 (2nd Dist. Ct. App. 2008) (covenant to use good faith and best efforts is "routinely implied" when licensor grants exclusive licensing rights in exchange for a percentage of profits or royalties); *Vectren Communications Services v. City of Alameda*, 2009 U.S. Dist. LEXIS 72811 *13 (N.D. Cal. August 18, 2009); *Ekland Marketing Company of California, Inc. v. Lopez*, 2007 U.S. Dist. LEXIS 48391 *4 (E.D. Cal. June 5, 2007).

*Cf.* Cal. Comm. Code §2306(2) (exclusive dealing contracts for the sale of goods require the buyer "to use best efforts to promote their sales.").

As explained in more detail in the Defendants' recent opposition (Docket No. 91), none of these allegedly missing purported deliverables was either material to the development process nor due to be delivered by Descendent, and Little Orbit has never even actually stated that it does not have them. (Peterson Declaration ¶ 19).

The only asset that the Defendants have not previously completely delivered in response to Little Orbit's improper and illegitimate demands is the writable, executable copy of the game software archive history. This was lost (except for the read-only files) when Little Orbit stopped paying on the Original Contracts because it was out of money, terminated the Original Contracts and then completely stopped paying. As a result, Little Orbit rendered the Defendants unable to pay the $2,000 per month server maintenance fees to maintain the writable, executable version of the game code history. (Peterson Declaration ¶ 20).

The Defendants did make sure to keep and maintain the game code, because the Defendants knew that the game code is all that is necessary to finish the game. (Peterson Declaration ¶ 20). In fact, the game code necessary to complete the development process had been delivered to and downloaded by Little Orbit in November of 2018. In fact, Matt Scott of Little Orbit downloaded the entire game software on or about November 20, 2018, with assistance from Descendent, shortly before Little Orbit breached and then terminated the Original Contracts by shorting a due payment. The Skype messages attached to the Peterson Declaration as Exhibit G were generated in connection with Descendent helping Little Orbit to download and acquire the November 2018 game code. The game code automatically updated daily through about February 15, 2019, the time of Little Orbit's wrongful termination. Little Orbit had and needed access to the daily updated game code to build and work on the different API that Little Orbit insisted on, promised to complete and then failed to complete. (Peterson Declaration ¶ 21).

1    Little Orbit's purported reliance on the storage requirement in Section 3.8 of
2 the Development Agreement that Little Orbit materially breached, terminated,
3 novated and displaced is erroneous and misplaced for all of the reasons stated above
4 on pages 6 to 8 as to why the Original Contracts no longer apply. In addition,
5 Section 3.8 of the Development Agreement is inapplicable by its express terms.
6 First, Little Orbit did not provide any "requirements" or directions for off-site
7 storage as required by Section 3.8. Second, the "final version" of the game was
8 never delivered due to Little Orbit's breach and wrongful termination of the
9 Original Contracts. Therefore, the storage requirements and Section 3.8 are
10 inapplicable by their express terms. (Peterson Declaration ¶ 22).

## III. LITTLE ORBIT IS NOT ENTITLED TO ANY EXTENSIONS OF TIME NOR TO <u>ATTORNEYS' FEES</u>

It is shocking and gravely disappointing that Little Orbit apparently admits in Paragraph 3 of Matt Scott's reply declaration that Little Orbit has made virtually no effort to develop the game in the past eight months since the BSTS was signed in November of 2020. This is truly inexcusable given that: (1) the game software is the only asset that was actually needed to complete development of the game; and, (2) Defendants have now established through documentary and testimonial evidence (Ex. G) that Little Orbit has had actual possession of the game software since at least November of 2018. (Peterson Declaration ¶ 23). That by itself is a sufficient basis for denying Little Orbit's request for the court to again extend its deadlines and thereby re-write the BSTS.

The court previously found that the BSTS was the "written memorialization" from which Little Orbit's deadlines began to run, and Little Orbit did not object to nor file any exceptions to that finding. It was completely irresponsible for Little Orbit to wait five to eight months after the BSTS was signed to make any effort to develop the game.

It is clear from the plain language of the BSTS that Defendants' obligations

were limited to LICENSING the game IP and delivering ONLY a few specified items of customer data. (BSTS Sections 10 and 12). *Inclusio unius est exclusio alterius* (the inclusion of one signifies the exclusion of the other). In the settlement of disputes or litigation, it is common to have IP licenses which are not accompanied by any obligation by the licensor to deliver the IP to the settling licensee. There is no implied obligation to deliver the licensed IP to the adverse party. (Whitticar Declaration ¶ 4). Because Defendants had no obligation to DELIVER any game IP, Little Orbit cannot use its improper and illegitimate demands for made-up IP deliverables as an excuse for its lack of development efforts for the past eight months, for not making the payments due to Descendent, nor to extend its deadlines. (Peterson Declaration ¶ 23).

Defendants have formally demanded that Little Orbit disclose the status of its development efforts, its financial condition, and the status of its fundraising efforts. (Ex. E). Little Orbit's failure to respond is only further evidence that it has done virtually nothing to finish the game for the past eight months and lacks the funds to complete the game. Mr. Richardson's offer that he "would propose" putting money in escrow on or after the June 23, 2021 payment due date provides zero evidence that Little Orbit actually had or has the money to actually be put into escrow. (Richardson Declaration ¶ 4). In fact, Little Orbit still has not paid the money it owes Descendent despite acknowledging that it now has as all the necessary game assets.

Defendants also noted in their opposition to the motion to set aside, and directly to Mr. Richardson by telephone, that Little Orbit had never actually even stated or testified that it had not in fact had possession of or access to any of the allegedly missing game IP assets. Mr. Richardson said that that issue would be addressed in Little Orbit's reply brief. (Whitticar Declaration ¶ 5). It was not. In fact, Little Orbit still has provided no statement or testimony stating that it did not actually have or have access to any of the allegedly missing game IP assets. At this

point, the court should either infer and conclude that Little Orbit actually had access to the game IP assets, or the court should permit Defendants to depose Matt Scott on those issues, and on the adequate assurance issues addressed above.

Little Orbit admits that it filed its motion to set aside only two days after (half-way) conferring with Mr. Whitticar, in violation of Local Rule 7-3. Descendent provided the development history and art source repository on June 29, 2021. Had Little Orbit properly met and conferred and waited the required seven days until June 28, 2021 to file its motion, its motion would have been unnecessary because it would have been informed that the game history and art source files had been located and were being recovered, all before filing its motion. (Peterson Declaration ¶ 24). Instead, Little Orbit had such a great need and desire to skip the payment due on June 23, 2021, that it prematurely filed its motion without waiting the required seven days. Mr. Richardson's version of meeting and conferring two days before filing was to merely threaten to file a duplicative motion to set aside without stating what the basis for it would be and without asking whether Defendants would agree to it or could address the undeclared grounds for it. (Whitticar Declaration ¶ 6).

Thus, Little Orbit's motion to set aside and/or extend deadlines should be denied as premature and procedurally improper, and Little Orbit certainly should not be awarded any attorneys' fees.

If Little Orbit actually has the funds to make first settlement payment, it can make it at any time. However, there is simply no valid excuse for Little Orbit missing the extended second deadline for this payment.

### IV. STATUS OF NEGOTIATIONS

While the Defendants are content with the BSTS, they are always willing to engage in constructive re-negotiations with Little Orbit over the BSTS. The Defendants simply need to get paid first. Also, the Defendants want Little Orbit to engage in reasonable, responsive, meaningful private negotiations, not just more threats and posturing, before again imposing on the Court to re-settle the same case.

(*See* Ex. B to Richardson Reply Declaration). In fact, the Defendants have offered Little Orbit two potential paths for renegotiating the BSTS. (*Id.*) However, it is telling that Little Orbit has not made a single settlement proposal in the four weeks since it skipped the first settlement payment and moved to set aside the BSTS. (Whitticar Declaration ¶ 6). This shows that Little Orbit is simply trying to delay because it is unable and/or unwilling to pay. Little Orbit obviously is not interested in sincere, meaningful efforts to renegotiate the BSTS, but is merely stalling for time.

## V. CONCLUSION

In short, Little Orbit admits that it has all of the assets necessary to complete the game, but it still has not made any of the settlement payments due to Descendent. Therefore, Descendent requests the Court to order Little Orbit to pay Descendent the funds that should have been paid within 120 days (or at least within the first thirty days) after the BSTS was signed, to pay the Defendants ▇ percent of the first $▇▇▇ in revenues or gross income, and to pay the Defendants $7,500 in attorneys' fees and litigation expenses incurred in enforcing the BSTS. (Whitticar Declaration ¶ 9).

In addition, due to Little Orbit's prior bad payment history, breaching of the BSTS, and poor credit report, Little Orbit should be required to provide the Defendants with the previously requested proof of funds, bank and financial statements, development status disclosure and fund-raising status disclosure, all as adequate assurance of due performance. *Coker Equipment Co., v. Witting*, 366 Fed. Appx. 727, 732 2010 U.S. App. LEXIS 2984 **4-6 (9th Cir. 2010) (the defendant "breached the contract by failing to provide adequate assurance of due performance"); *Price v. U.S. Monolithics, LLC*, 2005 U.S. Dist. LEXIS 53065 **1-8 (S.D. Cal. 2005) (party may demand adequate assurance of due performance under Restatement (Second) of Contracts § 251); Restatement (Second) of Contracts § 251.

| | |
|---|---|
| Dated: July 21, 2021 | Respectfully submitted,<br><br>By: _____<br>Counsel<br><br>Nada I. Shamonki (SBN 205359)<br>MINTZ LEVIN COHN FERRIS GLOVSKY<br>AND POPEO P.C.<br>2029 Century Park East, Suite 3100<br>Los Angeles, CA 90067<br>Telephone: (310) 586-3200<br>Facsimile: (310) 586-3202<br>Email: nshamonki@mintz.com<br><br>Michael C. Whitticar (*admitted pro hac vice*)<br>NOVA IP Law, PLLC<br>7420 Heritage Village Plaza, Suite 101<br>Gainesville, VA 20155<br>Tel: 571-386-2980<br>Fax: 855-295-0740<br>E-mail: mikew@novaiplaw.com<br><br>*Counsel for Defendants* |

# CERTIFICATE OF SERVICE

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Los Angeles, State of California, and am not a party to the above-entitled action.

On July 21, 2021, I filed a copy of the following document(s):

**[REDACTED] MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' SECOND MOTION TO ENFORCE THE BINDING SETTLEMENT TERMS SHEET, FOR A MONEY JUDGMENT, AND FOR AN AWARD OF ATTORNEYS' FEES**

By electronically filing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

- **Leo Edward Lundberg , Jr**

    leo.law.55@gmail.com

- **Michael Danton Richardson**

    mdantonrichardson@yahoo.com

Executed on July 21, 2021, at Los Angeles, California. I hereby certify that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

/s/ Diane Hashimoto
Diane Hashimoto

-1-