1  M. DANTON RICHARDSON (State Bar No. 141709)
   mdantonrichardson@yahoo.com
2  LAW OFFICES OF M. DANTON RICHARDSON
   131 N. El Molino Ave., Suite 310
3  Pasadena, CA 91101
4  ***Attorneys for Plaintiff,***
   LITTLE ORBIT LLC
5
                              **REDACTED**
6

7              **UNITED STATES DISTRICT COURT**
8              **CENTRAL DISTRICT OF CALIFORNIA**

9  LITTLE ORBIT LLC, a California Limited          ) Case No.: 8:20-cv-00089-DOC-JDE
   Liability Company,                              )
10                                                 )
                                                   ) Judge: Hon. David O. Carter
11              Plaintiff,                          )
                                                   ) **PLAINTIFF LITTLE ORBIT LLC'S**
12      vs.                                         ) **OPPOSITION TO DEFENDANTS'**
                                                   ) **MOTION TO ENFORCE THE COURT'S**
13                                                 ) **JULY 27, 2021 ORDER, FOR**
   DESCENDENT STUDIOS INC., a Texas                ) **CONTEMPT SANCTIONS, FOR A**
14 corporation, and ERIC PETERSON, an              ) **DECLARATION OF ENTITLEMENT**
   individual,                                     ) **TO SUSPEND OR TERMINATE THE**
15                                                 ) **SETTLEMENT AGREEMENT AND IP**
                                                   ) **LICENSE, AND TO ENJOIN LITTLE**
16              Defendants.                         ) **ORBIT FROM RELEASING THE GAME**
17 _____        )
                                                   ) **[FILED CONCURRENTLY WITH THE**
18 DESCENDENT STUDIOS INC., a Texas                ) **OPPOSITION DECLARATIONS OF**
19 corporation,                                    ) **MATTHEW SCOTT AND M. DANTON**
                                                   ) **RICHARDSON]**
20              Counterclaimant,                    )
                                                   )    **REDACTED**
21      vs.                                         )
                                                   ) **EVIDENTIARY HEARING**
22                                                 ) **REQUESTED**
   LITTLE ORBIT LLC, a California Limited          )
23 Liability Company,                              ) **Date: November 22, 2021**
                                                   ) **Time: 8:30 a.m.**
24              Counter Defendant.                  ) **Courtroom: 9D**
25 _____        )
26

27
                              1
28 _____

## I.   INTRODUCTION

Defendants Descendent Studios, Inc. ("Descendent") and Eric Peterson's ("Peterson") Motion to Enforce the Court's July 27, 2021 Order, for Contempt Sanctions, for a Declaration of Entitlement to Suspend or Terminate the Settlement Agreement and IP License, and to Enjoin Little Orbit from Releasing the Game (the "Motion") should be denied in its entirety.  Most importantly, the Motion raises various factual disputes which require an evidentiary hearing to address.

First, Defendants are asking the Court to enforce an Order for which a Motion is currently pending seeking approval of a cash supersedes bond.  Such a bond will stay enforcement of the Court's July 27th Order and the Court should grant that Motion rather than Defendants' Motion.  Defendants' attempt to get around such a stay by arguing the Court should enforce the Order through its contempt power is a transparent attempt to circumvent the stay that will follow from the Court's approval of a cash bond.  All Defendants are entitled to – if anything at all - is the $100,000 addressed by the July 27th Order and the bond will provide the funds to pay that amount to Defendants together with interest should Little Orbit's appeal be unsuccessful.  As such, no contempt ruling is necessary or appropriate.

Second, because there is a legitimate question as to whether any funds are currently owed given the remedy provision of paragraph 4 of the Binding Settlement Terms Sheet ("BSTS"), which issue is on appeal, there is no basis for Defendants to claim breach and the Court should deny the requested declaration.

Third, Defendants' request for an injunction should be denied because Defendants have not even addressed, let alone satisfied, the elements required for an injunction.  Rather, the Motion, almost in passing, simply concludes that an injunction is appropriate.  It also bears noting how hypocritical Defendants are being, having first questioned whether Little Orbit had the financing necessary to fund completion of the game and now, once it has been made clear that Little Orbit does indeed have the necessary funds, trying to stop Little Orbit from finishing and releasing the game.

Should the Court determine to enter an injunction preventing the release of the game then it should also require Defendants to post a bond of no less than the $2,000,000 in lost profits that Defendants argue would be lost as a result of a delay in the release of the game.

It bears noting that Little Orbit has repeatedly asked Defendants to agree to a stay of all deadlines under the BSTS pending the outcome of Little Orbit's appeal but Defendants have steadfastly refused in order to keep the pressure on Little Orbit and try to force Little Orbit to accept demands for a new and different deal that Defendants have proposed.

It has become blatantly obvious what Defendants have been trying to do - insisting on a shortened deadline for release while doing everything they can to prevent Little Orbit from meeting that deadline, including refusing to turn over the game code and game IP assets covered by the license. Defendants went so far as to claim those assets had been "destroyed" wasting more time by forcing Little Orbit to file a Motion to Set Aside the BSTS. But now, since Little Orbit put in so much time and effort to get the game ready on time based on the deadline set in the Order, all Defendants can do is falsely claim a breach to try and kill the license so Descendent can enter into a new license with InterPlay.

## II.    ARGUMENT

### A.    Defendants Did Not Meet and Confer Regarding their Request for An Injunction

Defendants' counsel provides a conclusory statement that the parties met and conferred "in a good faith effort to resolve the issues presented in this motion." Whitticar Decl., ¶ 3. In fact, while the parties did discuss Defendants' plan to move for enforcement of the Court's July 27, 2021, Order and for contempt, the parties also met and conferred regarding Little Orbit's plan to post a cash supersedeas bond to stay enforcement of such order. Given the Defendants' delay since that time and its failure to bring any such motion it appeared that the posting of a bond would have resolved any issue of Little Orbit allegedly not paying sums Defendants' claim are due. Apparently, Defendants have now had a change of heart.

Worse, Defendants have also lumped into their current Motion a request for an injunction even though there was absolutely no mention of any plan to seek an injunction during the

3

parties' meet and confer on September 22 and 23, 2021.  Defendants' request for an injunction should be denied on that basis alone, not to mention Defendants' delay in seeking any such relief for at least a month since the parties alleged meet and confer efforts.[1]  The fact that Defendants have not been diligent in seeking such drastic relief shows it is merely an afterthought tagged onto Defendants' current Motion and not something which will cause Defendants any irreparable harm.

**B.   The Court Lacks Jurisdiction to Address the Merits of the July 27, 2021, Order Which is Now on Appeal**

The filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal.  *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 379, 105 S.Ct. 1327, 1331 (1985) (citing *Griggs v. Provident Consumer Disc. Co*., 459 U.S. 56, 58, 103 S. Ct. 400, 402 (1982).  *Griggs* held that once a notice of appeal is filed, the district court is divested of jurisdiction over the matters being appealed.  *Griggs*, 459 U.S. at 58.; See also *McClatchy Newspapers v. Central Valley Typographical Union No. 46,* 686 F.2d 731, 734 (9th Cir. 1982). The purpose of the rule is to promote judicial economy and avoid the confusion that would ensue from having the same issues before two courts simultaneously. *Masalosalo v. Stonewall Ins. Co*., 718 F.2d 955, 956 (9th Cir. 1983); 20 James Wm. Moore, Moore's Federal Practice, § 303.32[1] (3d ed. 2000). The principle of exclusive appellate jurisdiction is not, however, absolute.  *Masalosalo v. Stonewall Ins. Co*., 718 F.2d 955, 956 (9th Cir. 1983); 20 Moore's § 303.32[2][b].

---

[1]  Had Defendants met and conferred as to an injunction they would have learned that Little Orbit is agreeable to delaying the release of the game provided there is also an agreement that the deadline under the Court's July 27, 2021, Order is also agreed to be stayed.  In other words, it is most unreasonable for the Defendants to argue Little Orbit will be in breach of the agreement if the game is not released by November 17, 2021, while at the same time doing everything they can to interfere with that process, including now asking the Court to block the release.

4

The district court retains jurisdiction during the pendency of an appeal to act to preserve the status quo. *Newton v. Consolidated Gas Co.,* 258 U.S. 165, 177, 42 S.Ct. 264 (1922); *Hoffman v. Beer Drivers & Salesmen's Local Union No. 888,* 536 F.2d 1268, 1276 (9th Cir. 1976); *United States v. El-O-Pathic Pharmacy,* 192 F.2d 62, 79 (9th Cir. 1951); *Nat. Res. Def. Council v. Sw. Marine, Inc.,* 242 F.3d 1163, 1166 (9th Cir. 2001). But what Defendants are seeking by their Motion is not to preserve the *status quo* but instead to enforce an order which is on appeal, all while a there is a motion pending for approval of a supersedeas bond.

The cases cited by Descendent merely stand for the proposition that the Court can issue orders to maintain the *status quo* pending appeal, and it may enforce the order absent a supersedeas bond. *Rains v. Flinn (In re Rains),* 428 F.3d 893, 903 (9th Cir. 2005) is inapposite, as it involved an interlocutory order of a bankruptcy court and merely stands for the proposition that if the order at issue is interlocutory, any appeal would be premature and would not transfer jurisdiction to an appellate court.

### C.     No Contempt Order is Appropriate

Little Orbit has applied for a supersedeas bond and that Motion is currently pending before the Court. Descendent seeks to "slip in" before a bond is issued and change the status quo by imposing monetary sanctions on Little Orbit to coerce compliance with the Order which on appeal. Descendent has failed to establish that Little Orbit's appeal lacks merit or that there is no likelihood that Little Orbit will prevail on appeal, especially as to the issues regarding the applicability of the paragraph 4 remedy clause in the BSTS, which was not addressed by the Court, and the deadline to release the game which under the Court's June 17, 2021, Order would be due by May 24, 2022. Defendants' Motion does not even address these points other than the following vague and conclusory statement:

> All of the arguments that Little Orbit claims it wanted to make in its opposition to Defendants' second motion to enforce the BSTS are barred by the May 24, 2021 Report and Recommendation (and by the June 17, 2021 order adopting it), or they were made and rejected in Little Orbit's motion to set aside the settlement agreement (on which no hearing was requested), or both. [Memo at 11:13-17]

5

The foregoing is demonstrably false as Little Orbit was never provided any opportunity to address the application of the remedy provision provided by paragraph 4 of the BSTS, or Defendants' claim that Little Orbit must produce "adequate assurance" or has not been diligent in developing the game, as those matters were not at issue in the cited proceedings.

Most notably, Defendants have argued in their Motion that the June 17, 2021, Order is final and binding on the parties. Memo at 9:20 – 10:4. If that is the case, then that Order should also control as to the applicable deadline for when the game must be released for sale.

Defendants recognize that a supersedeas bond bars the relief they are seeking but try to get around that fact by arguing the July 27,2021 Order "is not a final, executable money judgment." [2] Memo at 8:18-20. Defendants' logic is flawed, however, because if the Order does not order payment of a "sum certain" for which a bond would stay enforcement then there is likewise no basis for contempt as "No specific payment amount was ordered." Memo at 8:23. See *Haeger v. Goodyear Tire & Rubber Co*., 793 F.3d 1122, 1132 (9th Cir. 2015) ("Before awarding sanctions pursuant to its inherent power, 'the court must make an express finding that the sanctioned party's behavior "constituted or was tantamount to bad faith." ' ") (citing *Leon v. IDX Sys. Corp*., 464 F.3d 951, 961 (9th Cir. 2006).)

Defendants' attempt to draw baseless distinctions in arguing the Order does not support a bond, yet can support a contempt order, should be rejected. The point is still the same – if the Order requires a certain payment (and we know from the context that amount is $100,000, which not coincidentally is the exact amount Defendants are seeking to recover by way of a contempt order), then it is subject to a stay by the posting of a bond and the Defendants should not be allowed to side-step that process by claiming Descendent is otherwise entitled to payment before the appeal is resolved.

---

[2] At least we now know why Defendants made such a novel argument in opposition to Little Orbit's Motion for Approval of a Cash Bond – so Defendants can make the argument in their current Motion that the Order should be enforced through the Court's contempt powers. That is the very purpose of a bond, however, to stay such enforcement pending the outcome of the appeal.

**D.     Little Orbit's Chances of Success on Appeal**

Defendants argue that Little Orbit has no chance of success on appeal, but focus their pages of argument on the single issue of Little Orbit's claim regarding its mistake as to the meaning of "revenues" while totally ignoring the key issue as related to its Motion – whether any payments are due given the meaning and effect of paragraph 4 of the BSTS which was especially negotiated to provide an alternative to the up-front payments.   Declaration of Matt Scott ("Scott Decl."), ⁋ 10.   Unfortunately, that is a clause that has never been addressed and which, as shown herein, provides an alternative method of payment for the up-front payments by providing Defendants with a bigger share of the initial revenues.   Little Orbit was also denied the opportunity to explain its delay in starting development of the game (lack of the up-to-date game code and other game IP assets), the reason no earlier request for same had been made (due to the parties working on the long form agreement and delay caused by a new proposed deal with InterPlay taking over the development) and the Court appears to have believed a copy of the game code was given to Little Orbit after the signing of the BSTS, which was not the case. Scott Decl., ⁋ 26.   The Court also denied Little Orbit any "extension" of the deadline to complete the game even though Little Orbit was not seeking an "extension" but that the deadline should run from when Defendants finally turned over an up-to-date and editable version of the game code and other game IP assets, or at the very earliest, one year from the May 24, 2021, date mandated by Magistrate Judge Early and adopted by the Court's June 17, 2021, Order.

**E.     Little Orbit is Not in Breach**

Defendants spend much of their Motion arguing that Little Orbit is in breach of the BSTS by not making the upfront payments addressed in paragraphs 1-3, never mind the alternative payment provision provided for in paragraph 4, and allegedly not timely providing adequate assurance (which Little Orbit did in fact provide).

Defendants repeatedly complain that Little Orbit still has not made any payments under the BSTS or as addressed by the Order.   But that is one of the very purposes of Little Orbit's appeal – to determine whether any such payments should be required at all given the parties'

disagreement (mistake/no meeting of the minds) regarding the meaning of "revenues" as used in the BSTS and also when or if any advance payments are due given the parties expressly provided for a remedy for any late payments (see discussion above).

### 1. Paragraph 4 of the BSTS Provides a Remedy if the Up-Front Payments are Not Timely Made

The issue of whether the upfront payments are required – or whether the alternative method of payment found in paragraph 4 makes up for any missed advance payments – are issues on appeal and will ultimately be resolved on appeal or perhaps by this Court on remand. Therefore, the Court should not "enforce" those payments given Little Orbit's Motion for Approval of a Cash Supersedeas Bond which will stay such enforcement and provide the funds necessary to pay Defendants should Little Orbit's appeal be unsuccessful. The point is – Defendants will be fully paid however the issues are ultimately determined.

The very purpose of the bond sought by Little Orbit is to provide the funds necessary to pay Descendent such advance payments should further proceedings in this matter determine those payments were due and are not, instead, made up for by remedy provision of paragraph 4. That is the remedy that is available to Defendants and the funds will be available to make Defendants whole should Little Orbit lose that issue on appeal.

Defendants have attempted to paint Little Orbit as a manipulative and bad faith partner in the BSTS looking to stiff them on guaranteed payments. This is simply not true. Little Orbit has every intent of complying with its obligations under the BSTS but there is a substantial question on appeal as to whether the payments ordered by the Court are due given the BSTS also provides for an alternative method of payment which was not addressed by the Court.

The structure of the payment provisions in the BSTS, which includes not only upfront payments but an alternative method of payment, exists for a reason. At the time of settlement between the parties, the was no agreement with InterPlay in place for the use of the famous DESCENT brand name. Without that name, the underlying Game and IP would be worth substantially less and would likely see a dramatic reduction in sales. Little Orbit specifically negotiated a remedy of an alternative method of payment in the BSTS for the upfront payments

to account for this uncertainty.[3]  Post settlement, when Little Orbit attempted to secure the license, InterPlay demanded abusive, expensive terms far more costly than the original license for the DESCENT name.  Over the course of several weeks, InterPlay refused to negotiate, and ultimately Little Orbit was unable to secure the name.  As a result, Little Orbit skipped the payments to proceed with the pre-agreed alternative remedy.  The BSTS includes a remedy provision should any of the required "upfront" payments not be paid timely, and that is for Defendant Descendent Studios Inc. to be paid a bigger share of the initial revenues to make up for those missed payments.[4]

It is important to understand the nature of the payment structure provided in the BSTS. Defendants negotiated for several upfront payments as part of the BSTS (paragraphs 1-3).  On the other hand, Little Orbit negotiated for - and the parties agreed to - paragraph 4 which was intended as an alternative form of payment should any of the advance payments not be made on time.  Specifically, paragraph 4 provides that Descendent would receive a larger portion ████ of the first ████ in revenues instead of the lesser amount ████ that would have otherwise been the applicable royalty rate.  That difference was intended to make up for any late advance payments and was not intended to provide Defendants with a more than "double recovery" which is how Defendants are arguing the clause should be read – i.e., that Descendent is entitled

---

3  Defendants argue that Little Orbit "fraudulently induced the settlement agreement by making payment promises without the intent to perform them."  Memo at 4:14-15. Negotiating for and receiving an agreement to an alternative method of payment can by no means be considered fraudulent especially considering the subject clause was agreed to by the Defendants.

4  It is worth noting that this litigation against Descendent Studios was based on Defendants' material breaches of contract including not assigning the InterPlay license when it was obligated to do so in late 2019, and then subsequently denying Little Orbit access to the game code that was largely paid for by Little Orbit.  Descendent was given 30 days to cure and assign the license in early 2020, but it willfully refused resulting in Little Orbit's termination of the development agreement.  Little Orbit made several offers to finish the game and still pay Defendants their share of royalties contained in the original development agreement, but Defendants refused to cooperate.  This led to InterPlay's termination of Descendent's license to use the "Descent" name and forced Little Orbit to sue Descendent Studios to gain access to the game code in order to be able to complete and release the Game.

to both the upfront payments and the sums provided for in the alternative payment clause, paragraph 4 of the BSTS.  Defendants' argue paragraph 4 "was expressly stated as a remedy for any one "<u>payment</u>" (singular) that was not made '<u>on time</u>.' "  memo at 6:8-9.  However, the express language is to the contrary.  This is perhaps best evidenced by the fact that in its argument Defendants have had to add the word "one" to try to interpret the clause to read as "any one 'payment' " to try to make it read as "singular" when "any" is not singular at all.

The clause expressly states that if "ANY" payment is not made on time Little Orbit is to pay Descendent ███ of the first ████████ in revenues (in leu of the otherwise applicable 20%). The language expressly provides for Descendent's remedy in the event Little Orbit defaults on ANY payment.  "Any" by definition would also include "all".

It is also critical to know that Defendants' interpretation of paragraph 4 has changed since the BSTS was negotiated.  Their original interpretation is clearly stated in the first draft of the settlement long form which Defendants proposed.  Declaration of M. Danton Richardson ("Richardson Decl."), Exhibit A.  This first draft was created in December 2020 exclusively by Defendants' counsel with no input from Little Orbit.  In it, defense counsel outlines that the ██████ split was the sole remedy for at least some missed payments.  See paragraph 4 on page 2 ("If either or both of the second or third payments is not timely made and received, then Little Orbit shall pay Descendent ████ percent of the immediately following Seven Hundred Thousand Dollars (████████) in gross revenues….").  Defendant's counsel did inaccurately state that the first payment was mandatory, and if it was missed then Defendant had the right to proceed with publishing the game and splitting revenue with Little Orbit ████ but that is not what is provided in the BSTS.  Mr. Peterson tried to justify this switch in an email dated January 13, 2020, stating: "The initial payment was not a trigger for the ██% of ████ in revenue, only the 2nd and 3rd payments if missed triggered that."  Richardson Decl., Exhibit B.  The language of the BSTS contains no such distinction.

What is important is the fact that both Mr. Peterson and his counsel previously acknowledged that the ██████ split was the remedy if the upfront payments were missed (though incorrectly trying to distinguish between the first payment and the second and third payments). Defendants' previous admissions as to their understanding of the true meaning of paragraph 4 is

10

totally contrary to the later position that Defendants have adopted, including in the current Motion, and clearly shows that the remedy clause of paragraph 4 was intended to make up for "any" missed payments, notwithstanding the unsupported distinction Defendants included in their first draft of the long form agreement.

Defendants have since changed tactics and argued a much more abusive interpretation of paragraph 4 (i.e., that paragraphs 4 is not the exclusive remedy and that they should get both the upfront payments and the make-up funds provided for in paragraph 4) when they presented their Second Motion to Enforce.  Unfortunately, Little Orbit was never able to present opposition and evidence contradicting Defendants' assertions before that motion was ruled upon on July 27, 2021.

Interestingly, Defendants try to explain away the distinction they added to the first draft of the long form agreement as their attempt to "renegotiate" as to the BSTS: "Descendent was attempting to renegotiate enhanced and earlier take-back rights under Section 13 of the BSTS in anticipation of ongoing disputes with Little Orbit."  Memo at 6, fn 3.  This admits that no such distinction between the handling of the first payment and the second and third payments was made in the BSTS as far as the applicability of the alternative payment arrangement provided in paragraph 4 but was something that Defendants added.

Defendants also argue the draft settlement agreement is not admissible under FRE 408 and no doubt make the "renegotiate" argument to try to claim the parties were still "negotiating."  That is not the case, however, as the draft settlement agreement was not itself any offer of compromise, nor was it made during compromise negotiations, but instead represents the Defendants' efforts at drafting a document consistent with the settlement reached in the BSTS.  Post settlement efforts to paper a transaction is not an offer of compromise. Rather, it is an after-the-fact expression of Defendants' understanding of the terms of the BSTS and is admissible as such.  As provided in 408(b), the "court may admit this evidence for another purpose" such as here to show Defendants' true understanding of the purpose and effect of paragraph 4 of the BSTS.  *Central Soya Co. v. Epstein Fisheries, Inc*., 676 F.2d 939 (7th Cir. 1982) (Testimony concerning compromise negotiations is admissible where testimony is not offered to demonstrate that defendant was or was not liable to plaintiff for breach of contract but

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

rather to demonstrate what terms of settlement were.); *Am. Bridge Co. v. Providence Place Group Ltd. Pshp*., 263 F. Supp. 2d 330 (D.R.I. 2003) (Fed.R.Evid. 408 did not prohibit partnership from offering settlement negotiations into evidence to explain terms of bridge company's settlement agreement (and release executed therewith) with contractor.)

The purpose of the paragraphs 1-3 in the BSTS read together with the alternative payment provision of paragraph 4 was to provide for either money upfront to Descendent or, if those upfront payments were not timely paid, then for Defendants to receive a bigger share of the first ████ in revenues (██ percent) as opposed to the otherwise applicable split (██%) to cover such payments.  To read the remedy clause as Defendants are now trying – i.e., Descendent gets the upfront payments AND the bigger percentage of the first ████ in revenues, is both contradictory to their prior interpretation at the time of settlement and would turn the remedy clause into unenforceable illegal penalty under Cal. Civil Code section 1671, subdivision (b): "[A] provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made."

In interpreting this statute, the California Supreme Court has noted: "A liquidated damages clause will generally be considered unreasonable, and hence unenforceable under section 1671 [, subdivision](b), if it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach. The amount set as liquidated damages 'must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained.' [Citation.] In the absence of such relationship, a contractual clause purporting to predetermine damages 'must be construed as a penalty.' " (*Ridgley v. Topa Thrift & Loan Assn.* (1998) 17 Cal.4th 970, 977, 73 Cal.Rptr.2d 378, 953 P.2d 484).

That is clearly the case here just on the face of such clause as it would add up to a ████ penalty for simply being late with any one or more of the advance payments required under paragraphs 1-3 of the BSTS.  A penalty of almost double the total amount due of ████ (or 7 times either of the required ████payments) simply cannot be, as a matter of law, an estimate of "a fair average compensation for any loss that may be sustained" for simply

12

being late with a payment.  Rather, as is clear, such remedy clause provided for an alternative
form of payment and was to make up for any or all missed payments (note alternative provision
kicks in after "default").  It would be an unenforceable illegal penalty as the amount bears no
rational relation to any alleged loss that could be suffered by Defendants simply for a payment
being late.  In fact, Defendants have never argued, let alone presented any evidence, that such
clause was the result of "a reasonable endeavor by the parties to estimate a fair average
compensation for any loss that may be sustained" as a result of any or all of the advance
payments not being timely paid.

### 2.    Little Orbit has Provided Adequate Assurance

Defendants argue Little Orbit failed to "timely" provide adequate assurance as ordered by
the Court.  The true facts are, however, that Little Orbit has complied with the Court's Order.
Proof of funds were being organized as part of Little Orbit's opposition to the Second Motion to
Enforce when the Order on appeal was issued.  To date, Little Orbit has provided proof of
███████ in funds available for development.  This is the exact amount Defendants have
claimed is necessary to complete and publish the game.  On September 24, 2021, Little Orbit
supplied financial statements.  Bank statements were provided under email cover dated
September 29, 2021, though the provided proof of ███████ in funds should have confirmed
that Little Orbit has resources necessary to fund the development of the game.  Little Orbit has
provided more than adequate assurance and took the extra step of providing September bank
statements after they become available in October 2021.  Scott Decl., ⁋ 29.

After the Court of Appeals denied Little Orbit's Motion for a Stay, Defendants' counsel
wrote an email to Little Orbit's counsel demanding compliance with the Court's Order regarding
adequate assurance by September 24, 2021, and inviting the parties to meet and confer in that
regard.  The parties conducted a telephonic meet and confer on September 23, 2021, during
which Little Orbit's counsel assured Defendants counsel that Little Orbit would comply with the
Court's Order regarding adequate assurance and further advising that Little Orbit's counsel was
on his way out of town for a long weekend and would provide Defendants with such materials
the following Tuesday on his return.  Defendants' counsel did not object to this timeline but yet

later that day sent an email purporting to suspend the license for Little Orbit's failure to provide adequate assurance and not making the first two payments allegedly due under the BSTS.  Little Orbit thereafter responded via email and provided Defendants with financial statements in addition to confirmation of having ▓▓▓▓▓ on hand to fund the development of the game.  Little Orbit then provided bank statements under email cover dated September 29, 2021, and also sent new September bank statements once they became available.

Defendants' arguments regarding Little Orbit's financial statements, raising issue such as Little Orbit having ▓▓▓▓▓ in debt on its books (debt from its as yet un-recouped $2.5 million investment into the game in issue), is disingenuous and a red herring.  In fact, Defendants are totally ignoring the fact Little Orbit has provided more than adequate proof of having the funds necessary to develop the game by showing its principals have agreed to provide the funds necessary to complete development and have provided proof of those funds, which Defendants admit.  Memo at 13:12 -13.

### 3.   Little Orbit Has Used its Best Efforts to Finish the Game and Has Acted in Good Faith Despite Defendants' Repeated Failure and Refusal to Cooperate

Defendants paint a very distorted and one-sided picture, arguing that Little Orbit has not used its "best efforts" to develop the game and is therefore in breach of the BSTS.  For example, Defendants argue "Little Orbit admittedly waited until at least June 2021 to begin its development efforts (Doc. No. 93-1 at ¶ 3), did not request the alleged technology tools for over four months (Doc. No. 97-1 at ¶ 19), and has spent only ▓▓▓▓▓ on the game in 2021. (Ex. 4: Cash Flow Statement)."  Memo at 14:22-25.  Interestingly, Defendants are making these arguments BEFORE Little Orbit has even missed the Court Ordered deadline of November 17, 2021.  Worse, Defendants use those arguments to support a claim that Little Orbit should be prevented from releasing the game at all.  The two positions are totally contradictory and should be rejected.

Defendants' arguments are easily rebutted.  First, the delay until June was caused by Defendants refusing to turn over the game code and game IP assets as licensed under the BSTS.

14

The code and IP were only turned over in June and July after Little Orbit was forced to file its Motion to Set Aside the BSTS due to the Defendants statement that it could not deliver those assets (but of course, somehow they were able to do so after Little Orbit filed its Motion).[5] Second, Little Orbit did not request such assets during the time the parties were negotiating the long form agreement as well as during the time that Defendants were trying to negotiate a new deal with InterPlay in which InterPlay would have taken over the development.  There was no need to start working on the development as the year deadline was not to start until the parties entered in a long form agreement.  Third, Little Orbit has spent substantially more than ▮▮▮▮ in taking over the development of the game after finally receiving the game code and related game IP assets.

When the parties entered into the BSTS on November 17, 2020, they intended to execute a more detailed long form agreement.  The terms of the BSTS are very skeletal and listed in summary fashion.  For example, the BSTS does not address such basic matters as when royalty payments are due and what accounting is required, etc.  One thing however is clear: Little Orbit knowingly took on the obligation of completing development 12 months from the "signing of a written memorialization."

Defendants removed Little Orbit's access to the game code when Little Orbit gave notice of breach.  Little Orbit had to sue Defendant in January 2020 to gain access to the game code, and it was understood that by agreeing to the BSTS and taking on a completion deadline, surely then Defendant would turn over the game code.  The date of the deadline to release the game is clear from the language of the BSTS itself which sets the deadlines for various obligations under

---

[5] Descendent has previously claimed it had no obligation under the BSTS to deliver anything to Little Orbit other than the specifically identified "pre-order data, Kickstarter data and early backer data to be provided by Descendent to Little Orbit."  See BSTS ¶ 10. This data, however, is not covered by the license so needed to be expressly addressed in the BSTS.  A license of "all game IP" would implicitly require delivery of the assets being licensed, that is, "all game IP," as that is a fundamental step necessary to carry out the intent of the license.  Defendants' argument otherwise is absurd and reveals its bad faith approach and failure to cooperate in this matter since the signing of the BSTS.

the BSTS based on so many "days of signing written memorialization." See, e.g., paragraphs 1 – 3 and 13. If such deadlines were intended to run from the date of the signing of the BSTS it would have been specified as such – so many "days from the signing of this agreement" or something similar. Rather, the intent was some future date based on the signing of a long form agreement.

Between December 2020 and April 2021, the parties attempted to flesh out the substance of the BSTS into a long form agreement. Defendants' counsel led this effort but did not produce the initial draft of the settlement long form until December 14, 2020, almost a month after the date of the settlement conference. Unfortunately, the parties were never able to agree on the long form due to key disputes on the "fine print" regarding some of the terms. During this same time, Little Orbit attempted to negotiate a new trademark license agreement with InterPlay, but those efforts were ultimately unsuccessful as InterPlay demanded significantly more onerous terms than under the original license agreement. [April 16, 2021, Stipulation and Request for Court to Retain Jurisdiction, Scott Decl., Exhibit C].

In May of 2021, Descendent brought their first Motion to Enforce the BSTS once the parties' efforts to enter into a long form agreement broke down, claiming Little Orbit was in breach for not having made payments due. That Motion was referred to Judge Early and was denied as premature given the parties failure to enter into a long form agreement. Magistrate Early also determined that the triggering date for the timing of the payments due under the BSTS would run from the date of the hearing (May 24, 2021).

Even though Little Orbit previously and repeatedly asked Descendent to deliver all of the game IP assets covered by the BSTS, no game code or assets were delivered. Finally on June 15, 2021, Descendent produced a snapshot copy of the game code as it existed on some unknown date. It is critical to note that up until that time, Little Orbit was not in possession of the current game code to meet their obligation in the BSTS and finish development of the Game. Scott Decl., ¶ 26.

This Court had previously determined that May 24, 2021, would be the trigger date for obligations in the BSTS running from the execution of a "written memorialization" which includes the one-year deadline to release the Game. That Order dated June 17, 2021, was not

16

challenged by the parties and is therefore final and binding in this matter as even Defendants acknowledge.  Memo at 9:22 – 10:1 ("Magistrate Judge's May 24, 2021 report and recommendation (Doc. No. 79), which neither side objected to"; " 'Failure to object to a magistrate judge's recommendation waives all objections to the magistrate judge's findings of fact.' *Turner v. Duncan*, 158 F. 3d 449, 455 (9th Cir. 1998); *Smith v. Frank*, 923 F. 2d 139, 141 (9th Cir. 1991); *Baxter v. Sullivan*, 923 F. 2d 1391, 1394 (9th Cir. 1991).").

In the July 27, 2021 Order, the Court ruled that "After signing the Settlement Terms Sheet ***and receiving the game code,*** Plaintiff could have started developing the Game."  Order at p. 8 (emphasis added).  However, Little Orbit did not receive the game code after the signing of the BSTS until June 15, 2021.  Scott Decl., ¶ 26.  It is disingenuous of Defendants to argue that Little Orbit has not used its "best efforts" to develop the game when Defendants had not turned over any game code until June 15, 2021, let alone "all game IP" as covered by the license.  Even then, the game code produced was simply an un-editable snapshot of the code as it existed as of some unknown time.

The parties signed the BSTS on November 17, 2020, but Descendent did not deliver the game code till June 15, 2021, nearly seven months later, and did not deliver the rest of the Game IP and source assets until June 29, 2021.  This latter delivery of the full game IP and source assets on June 29, 2021, was obviously prompted by and only occurred as a result of Little Orbit filing its Motion to Set Aside.  Prior to the filing of Plaintiff's Motion Defendants had maintained that such assets "no longer exist."  It took a motion for the Defendants to finally locate and provide such assets.

As noted in paragraph 12 of the BSTS: "Descendent provides exclusive license to LO on all game IP."  Such a license would require, at the very least, that the Defendants be able to provide Plaintiff "all game IP" in order to effectuate the license.  The game IP includes not only the game code as continued to be developed by Defendants for several months after the termination of the parties' prior Agreement, but all original artwork and the project history among other audio, media and software assets.  These are the building blocks which are needed to complete development of the game, not simply an un-editable version of the game code. Scott Decl., ¶ 4-5.

17

Little Orbit cannot be faulted for any delay in the re-start of development when that delay was first caused by the parties' efforts to negotiate the long form agreement which provided Little Orbit with one year from the signing of such "written memorialization" to complete development of the game.  Secondly, the development was delayed even further by Defendants' failure and refusal to produce the complete game IP assets until Little Orbit was forced to file a motion seeking to terminate the agreement for a failure of consideration.

It was the lack of current game code and IP assets that was the reason Little Orbit could not start development.  In spite of multiple requests Defendants refused to turn over the game code and IP assets multiple times until well into June 2021, more than six full months after the BSTS was signed.  Scott Decl., ¶ 26.

Additionally, the multiple Stipulations and Requests by the parties for the District Court to extend its jurisdiction reflect the parties were still actively engaged in negotiating the terms of a long form agreement as well as an agreement with a third party (InterPlay) as late as April 16, 2021: "WHEREAS the parties are still working to finalize their settlement, including necessary negotiations with a third party as provided for in the parties' agreement to settle as worked out by Magistrate Early, and jointly desire for the Court to retain jurisdiction for an additional sixty (60) days."  [April 16, 2021, Stipulation and Request for Court to Retain Jurisdiction, App. Vol. 4, at 245].

Defendants' draft settlement agreement also reflects the deadlines were to be triggered from the signing of a long form agreement by including the following language: "within 30 calendar days of the Effective Date of this Agreement" (with the "Effective Date" being defined as some yet determined date in December).  Richardson Decl., Exhibit A at pages 1 and 2.

Additionally, Mr. Peterson sent an email on January 8, 2021, following up about the status of the long form agreement: "Where are we on this? We have sent over the long form, this should not be delayed any further - this should be signed and executed so that Matt can get working on the game and we can move forward."  Richardson Decl., Exhibit C (middle email of the email string).  This confirms that Defendants did not expect Little Orbit to start work on game development until after the long form agreement was finalized and signed, which never occurred.

The absence of any such demand confirms that Defendants understood and agreed the triggering dates were all intended to be based on the signing of a long form agreement.  Once the parties' efforts to enter into long form agreement reached an impasse, Little Orbit recognized that the time would otherwise be deemed to start and requested the game code and all game IP assets.  As noted above, however, that game code was not provided until June, 2021 (though that was a non-editable snapshot version), and the other game IP assets were not delivered until later.  Defendants' assertion that Little Orbit has not made best efforts to develop the game is unequivocally false given that Little Orbit only had the full Game IP and code for less than a month between its delivery on June 29, 2021 and the Second Motion to Enforce filed on July 21, 2021.

### F.    Any Delay in the Release of the Game is of Defendants' Own Doing

Defendants argue "Descendent conservatively estimates that its damages from Little Orbit delaying the release by not paying the settlement payments will be at least $2 million per year while the appeal is pending."  Opp at 11:24 – 12:2. First, there has been no showing the game release will be delayed and Defendants' claim of damages are speculative at best.  Second, any such delay will only be if this Court grants Defendants' request for an injunction, in which event it is Defendants which should be required to post a bond in the amount they are seeking (see discussion below).

What Defendants are actually arguing is that Little Orbit is in breach of the BSTS and therefore Descendent has suspended the license because of the missed payments (payments which Little Orbit contends are made up for and covered by the alternative payment remedy provided in paragraph 4 of the BSTS).  Therefore, so the argument goes, the release of the game will be delayed because Descendent has suspended the license provided by the BSTS.  However, any such delay in the release of the game is not attributable to Little Orbit but rather is of Descendent's own doing by purportedly suspending the BSTS.  This is self-inflicted harm.  See, e.g., *Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020), citing *Hirschfeld v. Board of Elections*, 984, F.2d 25, 39 (2d Cir. 1993).

Defendants have no right to suspend or terminate the BSTS.  There is a legitimate dispute as to whether the advance payments must be paid or can be made up through a bigger share of the initial ███████ in revenues as provided in paragraph 4 of the BSTS.  That dispute will ultimately be resolved and Little Orbit has a Motion pending for approval of a cash bond sufficient to cover the amount in dispute together with interest should it lose as to its interpretation of the payment provisions contained in the BSTS.  Should the advance payments be determined to be owed, Descendent will receive what it is entitled to together with interest to cover any delay.  That will make Defendants whole and it would be totally inequitable to allow a party to suspend and/or terminate a contract where the proper remedy is money damages, which funds Little Orbit has already put aside and will post as a bond for Defendants' benefit should Defendants prevail.

### G.    No Injunction is Appropriate

Defendants argue that

> Based on these material breaches, Descendent has suspended the IP license provided to Little Orbit under the BSTS. (Ex. 3). Therefore, Little Orbit cannot lawfully or legally develop the game by creating derivative works nor copy the game by selling or licensing copies of it.  [Memo at 15:12-15]

Yet, Defendants do not address, let alone establish, any of the elements required to support an injunction, e.g. a showing of a likelihood of success on the merits and "irreparable harm."[6]  As addressed herein, there have been no breaches of the BSTS and if it is found that paragraph 4 does not provide for an alternative method of payment and that the Defendants are instead entitled to the up-front payments provided for in Order, Little Orbit has set aside those funds and has asked for the Court's approval of a cash supersedeas bond to ensure that Defendants are paid everything they are shown to be entitled.  That is Defendants' remedy for any alleged lack of payment, not termination or suspension of the IP license.  As such, Defendants cannot establish any "irreparable harm."

---

[6] *Winter v. Natural Resources Defense Council, Inc.* (2008) 555 US 7, 20, 129 S.Ct. 365, 374.

20

The balance of hardships do not weigh in favor of Defendants as it is Little Orbit that will be irreparably harmed by any injunction.  For example, Defendants will no doubt try to argue that any miss of the Court's mandated November 17, 2021, release deadline will trigger the forfeiture clause found in paragraph 13.  And it is that clause which provides for any remedy should Little Orbit fail to meet whatever the release deadline is determined to be, not any claim to lost profits as argued in its Motion.  In such event, Little Orbit would be out the approximately $2.5 million it previously invested in the game's development (not to mention the carrying charges on that sum incurred since then) as well as all of the efforts and funds it has invested in completing the game since July when it finally received the game source code and other game IP assets.

Since receiving the editable copy of the game code and other game IP assets Little Orbit has been diligently working on completing the game and plans to complete and release the game by the Court's imposed deadline of November 17, 2021, though Little Orbit believes the date is more properly May 24, 2022, based on the Court's June 17, 2021, Order providing that "To the extent the Settlement Agreement (Dkt. 48-1 (under seal)) used the phrase "within [__] days of signing [a] written memorialization" or similar language as a triggering event, such trigger date shall be the date of the Report and Recommendation, that is, May 24, 2021."[7]

The release of the game could have easily been pushed off but Defendants have refused to agree to stay the deadline for release and now instead seek to prevent the release of the game.  Defendants' hypocrisy is obvious.  First they questioned whether Little Orbit has the means to complete the game, but when it became abundantly clear Little Orbit had the means and every intent of complying with its obligations to complete and release the game for sale, Defendants

---

[7] One point which Defendants used to successfully oppose Little Orbit's arguments about its mistake regarding the meaning of "revenues" was the argument that the BSTS is a separate agreement from the underlying Development Agreement and Terms Sheet Addendum and those documents should not be viewed in determining the meaning of "revenues."  The same applies equally to Defendants' long after the fact attempt to argue for limitations or conditions regarding how the game should be released even though the BSTS does not contain any such limitations or conditions.

switched tunes and now argue an injunction is necessary to prevent the release of the game.  All this is based on: (1) alleged non-payment, which is addressed above; and (2) assumptions about the manner in which the game will be released (even though the BSTS does not include any specifications in that regard).  Defendants' speculation does not support an injunction.

Defendants argue "Little Orbit is trying to hastily release an early-access, sub-Beta-test development version of the game" and that this is in bad faith considering "Descendent published an early access version of the game in 2015 and would not have needed a publisher like Little Orbit to release an early access game."  Memo at 14:25 - 15:2. The argument is absurd on its face as the game as it now exists is substantially different than its early incarnation in 2015, some six (6) years ago.  Additionally, the very fact that Defendants were able to do an early access release did not change the fact that it still needed a "publisher like Little Orbit" to provide the funding required to complete the development, and that has nothing to do with the type of roll out the game receives for its release.

Defendants attack an "early access" release as if that is a bad thing.  In fact, an "early access" release is a common practice in the release of video games and can be and has been done multiple times with regard to various other games.  Scott Decl., ¶ 28 (f).  The real question is what is required by the BSTS – only that the Little Orbit must "release and sell" the game within one year from whatever start date is ultimately determined to be applicable).  The "early access" release planned by Little Orbit is, in fact, a release which will be for sale.  If Defendants wanted to place limitations or conditions on the type of release, Defendants could have negotiated for such restrictions but did not.  All the BSTS requires is that Little Orbit "sell" the game, and it will do so by the release date.

Defendants' other arguments about the quality of the game and that an early access release will "disrupt the game project, causing irreparable harm" are no more than assumptions and conjecture without any basis in fact and should be rejected.  Once the game is released Defendants can then raise any questions as to whether or not the release satisfied Little Orbit's obligations under the BSTS.

Defendants have also argued that Little Orbit's Cash Flow Statement reflects that as of September, 2021, Little Orbit had only spent ███████ on developing the game.  This is false (as

22

Defendants well know) because the financial statement only reflects third party costs and does not account for all of the work Little Orbit has performed on the game using its internal resources. Additionally, given the timing of the financial statements, even though Little Orbit's external developer had already begun work on the game, they had not yet issued any invoices for their work. Scott Decl., ¶ 29 (f).

### H. If The Court Issues an Injunction Against Little Orbit, Descendent Must Post a Bond in An Amount Sufficient To Cover Little Orbit's Potential Loss

FRCP 65(c) provides:

> **(c) Security.** The court may issue a preliminary injunction or a temporary restraining order *only if the movant gives security* in an amount that the court considers proper *to pay the costs and damages sustained by any party found to have been wrongfully enjoined* or restrained. The United States, its officers, and its agencies are not required to give security. [emphasis added]

Before setting the amount of the security bond, the Court should consider evidence regarding the potential financial ramifications of issuing a preliminary injunction. See, e.g. *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 733-34 (9th Cir. 1999) (considering declarations by both parties before setting amount of security bond). If Little Orbit is ultimately determined to have been improperly enjoined from proceeding with the release of the game, it will lose its anticipated profit of approximately $2,000,000. Scott Decl., ¶ 33. This amount is also supported by the fact that Defendants have claimed a delay in the release of the game will result in a $2,000,000 profit loss. Therefore, Little Orbit asks that the Court require Descendent to post a bond in the amount of no less than $2,000,000 (slightly less than 1.5 times the estimated $1.363 million in lost profits).

**III.    CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' Motion in its entirety.  The Court should also award Little Orbit its attorneys' fees in the amount of $9,240 for having to respond to Defendants' Motion.   Richardson Decl., ⁋ 7.

DATED: November 1, 2021          **LAW OFFICES OF M. DANTON RICHARDSON**


By:    /s/ M. Danton Richardson
M Danton Richardson

***Attorney for Plaintiff,***
Little Orbit LLC

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st Day of November, 2021, the foregoing **PLAINTIFF LITTLE ORBIT LLC'S OPPOSITION TO DEFENDANTS' MOTION TO ENFORCE THE COURT'S JULY 27, 2021 ORDER, FOR CONTEMPT SANCTIONS, FOR A DECLARATION OF ENTITLEMENT TO SUSPEND OR TERMINATE THE SETTLEMENT AGREEMENT AND IP LICENSE, AND TO ENJOIN LITTLE ORBIT FROM RELEASING THE GAME** was filed with the Court's CM/ECF system and was served on the following counsel of record via email:

Michael C. Whitticar; VSB No. 32968
NOVA IP Law, PLLC
155 Broadview Avenue, Suite 200
Warrenton, VA 20186
Tel:  571-386-2980
Fax:  855-295-0740
Email: mikew@novaiplaw.com
Counsel for Defendants

NADA I. SHAMONKI (SBN 205359)
MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone: (310) 586-3200
Facsimile: (310) 586-3202
Email: nshamonki@mintz.com
Counsel for Defendants

/s/ M. Danton Richardson
M. Danton Richardson